Paul Gattone
Arizona Bar # 012482
LAW OFFICE OF PAUL GATTONE
301 S. Convent
Tucson, AZ 85701
(520) 623-1922
*Attorney for Plaintiff*

# IN THE FEDERAL DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mariah Inzunza, as the personal representative of the estate of Sylvestre Miguel Inzunza, IV, deceased, for and on behalf of the estate and on behalf of the two surviving parents as statutory beneficiaries under state law, | Case No. 4:22-cv-00512-SHR |
| | |
|        Plaintiff, | **SECOND AMENDED COMPLAINT** |
| | |
| v. | **(Jury Trial Demanded)** |
| | |
| Pima County, a body politic; Chris Nanos, in his official capacity; NaphCare, Inc., a corporation; Humberto Cordero, in his individual capacity; Saul Montano, in his individual capacity; Sean Kuhn, in his individual capacity; Antonio Rivas-Pardo, in his individual capacity; | |
| | |
|        Defendants. | |

1

**JURISDICTION AND VENUE**

1. This court has subject-matter jurisdiction under 42 U.S.C. §§ 1983; 28 U.S.C. §§ 1331 and 1343; and the Fourteenth Amendment to the U.S. Constitution.

2. Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over all state law claims because each state law claim arose out of the same set of facts and is so related to the federal law claims that it forms part of the same case or controversy.

3. Plaintiff timely filed notices of claim related to her state-law claims, per A.R.S. § 12-821.01.

4. More than sixty days have elapsed since Plaintiff filed her notices of claim. None of the Defendants has responded to the notices of claim. The notices of claim are deemed denied per A.R.S. § 12-821.01(E).

5. Venue is proper under 28 U.S.C. § 1391(b)(2) in the District of Arizona because a substantial part of the events or omissions giving rise to the claim occurred in Pima County.

**PARTIES**

**<u>Plaintiff</u>**

6. Plaintiff Mariah Roseanne Inzunza (hereafter "Mariah") is a resident of Tucson, Arizona.

7. Mariah is the adult sibling of the deceased, Sylvestre Miguel Inzunza, IV (hereafter "Sylvestre").

8.  Mariah is the lawfully-designated personal representative of the estate of Sylvestre Miguel Inzunza, IV, having been appointed by the Pima County Superior Court on August 29, 2022.

9.  Pursuant to A.R.S. § 12-612(A), Mariah has standing to bring the state-law wrongful death claim in her role as personal representative of the estate.

10. Sylvestre died unmarried and intestate and left no descendants. He is survived by both his mother and father. Pursuant to A.R.S. § 14-2103, both parents are to inherit equally from the intestate estate. Although the surviving parents are to inherit equally, Mariah is the proper plaintiff as to the state-law wrongful death claim pursuant to A.R.S. § 12-612(A).

11. As to the state-law claims for wrongful death, Mariah brings such claims for and on behalf of the parents of the deceased.

12. The parents of the deceased are Rosanne Inzunza (also known as Rosanne Bustamante) and Sylvestre Miguel Inzunza, III. The parents were given notice of the probate proceedings in Pima County Superior Court and they both filed documents with the Superior Court waiving or otherwise renouncing their right to serve as personal representative on account of their priority.

13. Pursuant to A.R.S. § 14-3110, Mariah has standing to bring claims under 42 U.S.C. § 1983. *See, e.g.*, *Lee v. Arizona*, 2010 WL 1948584, at *2 (D. Ariz. May 12, 2010) (observing that in Arizona, "familial ties, without more, are insufficient to confer standing" under Sec. 1983 and holding that only a personal representative has

standing); *see also Davis v. City of Tucson*, 2015 WL 5782127, at *3 (D. Ariz. Oct. 5, 2015) (same).

### Defendant Pima County

14. Defendant Pima County is a body politic, whose powers are exercised by the County Board of Supervisors. A.R.S. § 11-201.

15. Pursuant to Article XII, Section 3 of the Arizona Constitution and A.R.S. § 11-201, the Pima County Board of Supervisors exercises both the legislative and executive powers of Defendant Pima County.

16. Pursuant to A.R.S. § 11-251, the Pima County Board of Supervisors is responsible to "supervise the official conduct of all county officers," including that of the Sheriff. *See, e.g.*, *United States v. Maricopa County*, 151 F. Supp. 3d 998, 1015 (D. Ariz. 2015), *aff'd*, 889 F.3d 648 (9th Cir. 2018); *see also Fridena v. Maricopa Cnty.*, 504 P.2d 58, 61 (1972).

17. This power of supervision includes the power over the Sheriff's jail policies. *See, e.g., Flanders v. Maricopa County*, 203 Ariz. 368 (Ariz. App. 2002) ("[t]he County is responsible for the Sheriff's jail policies.").

18. This power of supervision, however, does not extend so far as to confer authority to terminate individual corrections officers at the Pima County Adult Detention Center.

19. In addition to its authority to supervise the official conduct of the Sheriff, Defendant Pima County has an independent obligation pursuant to A.R.S. §§ 11-251 & 291(A) to provide healthcare to pretrial detainees housed at the Pima County Adult Detention

Center. *See, e.g., Gwen v. Yavapai Cnty. Jail Med. Providers*, 2022 WL 1017083, at *7 (D. Ariz. Apr. 5, 2022) ("[U]nder Arizona law, health care for inmates in the County Jails is the responsibility of the County, not the Sheriff or one of the Sheriff's captains.")

20. Defendant Pima County's obligation to provide healthcare includes the obligation to ensure that detainees are able to make their medical problems known to medical staff in a timely fashion.

21. Defendant Pima County's obligation to provide healthcare includes the obligation to ensure that licensed correctional healthcare providers and uniformed corrections officers are given the structures, tools, policies, technology, and training necessary to communicate with one another about a particular detainee's proclivity to seek out dangerous drugs inside the jail.

22. In exercising its authority with regard to detainee healthcare, Pima County has for decades directed the provision of healthcare within the Pima County Adult Detention Center. Pima County (and not the Pima County Sheriff) has issued RFPs, negotiated contracts, and executed contracts with private correctional healthcare providers since 2002. This includes the contract that was in force with Defendant NaphCare during the time that Sylvestre was housed at the Pima County Adult Detention Center.

**Defendant Chris Nanos**

23. Defendant Chris Nanos (hereafter "Nanos") is the duly-elected Sheriff of Pima County, Arizona.

24. Defendant Nanos was the Sheriff of Pima County during January and February 2022.

25. Defendant Nanos is a county officer as that term is used in A.R.S. § 11-251(1).

26. At all relevant times, Defendant Nanos acted under the color of state law.

27. Defendant Nanos is sued in his official capacity.

28. With the exception of the provision of healthcare to detainees, Defendant Nanos is responsible for day-to-day operations of the Pima County Adult Detention Center located at 1270 W. Silverlake Rd in Tucson, Arizona.

29. Pursuant to A.R.S. § 11-441, Defendant Nanos is responsible to "take charge of and keep the county jail . . . and the prisoners in the county jail."

30. Pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), Sheriff Nanos is a final policymaker of Pima County as it relates to the protection of pre-trial detainees from substantial risks of serious harm.

**Individual Defendants of the Pima County Sheriff's Department**

31. Defendant Humberto G. Cordero (Pima County Sheriff's Department # 7781) was employed in February 2022 as a corrections officer in the Pima County Adult Detention Center.

32. Defendant Cordero is sued in his individual capacity.

33. At all relevant times, Defendant Cordero acted under the color of state law.

34. Pursuant to A.R.S. § 11-409, Defendant Nanos was the appointing authority of Defendant Cordero. Accordingly, Defendant Nanos was responsible for training,

correcting, and disciplining Defendant Cordero for any identified deficiencies prior to February 1, 2022. *See, e.g., Hounshell v. White*, 220 Ariz. 1, 2 (Ct. App. 2008).

35. Defendant Saul Montano (Pima County Sheriff's Department # 8411) was employed in February 2022 as a corrections officer in the Pima County Adult Detention Center.

36. Defendant Montano is sued in his individual capacity.

37. At all relevant times, Defendant Montano acted under the color of state law.

38. Pursuant to A.R.S. § 11-409, Defendant Nanos was the appointing authority of Defendant Montano. Accordingly, Defendant Nanos was responsible for training, correcting, and disciplining Defendant Montano for any identified deficiencies prior to February 1, 2022. *See, e.g., Hounshell v. White*, 220 Ariz. 1, 2 (Ct. App. 2008).

39. Defendant Sean L. Kuhn (Pima County Sheriff's Department # 5276) was employed in February 2022 as a corrections sergeant within the Pima County Adult Detention Center.

40. As a corrections sergeant, Defendant Kuhn had supervisory responsibilities over other corrections officers on the night of February 1, 2022 and during the early morning hours of February 2, 2022.

41. Defendant Kuhn is sued in his individual capacity.

42. At all relevant times, Defendant Kuhn acted under the color of state law.

43. Pursuant to A.R.S. § 11-409, Defendant Nanos was the appointing authority of Defendant Kuhn. Accordingly, Defendant Nanos was responsible for training,

correcting, and disciplining Defendant Kuhn for any identified deficiencies prior to February 1, 2022. *See, e.g., Hounshell v. White*, 220 Ariz. 1, 2 (Ct. App. 2008).

44. Defendant Antonio Rivas-Pardo (Pima County Sheriff's Department # 6982) was employed in February 2022 as a corrections sergeant at the Pima County Adult Detention Center.

45. As a corrections sergeant, Defendant Rivas-Pardo had supervisory responsibilities over other corrections officers on the night of February 1, 2022 and during the early morning hours of February 2, 2022.

46. Defendant Rivas-Pardo is sued in his individual capacity.

47. At all relevant times, Defendant Rivas-Pardo acted under the color of state law.

48. Pursuant to A.R.S. § 11-409, Defendant Nanos was the appointing authority of Defendant Rivas-Pardo. Accordingly, Defendant Nanos was responsible for training, correcting, and disciplining Defendant Rivas-Pardo for any identified deficiencies prior to February 1, 2022. *See, e.g., Hounshell v. White*, 220 Ariz. 1, 2 (Ct. App. 2008).

### Defendant NaphCare, Inc.

49. Defendant NaphCare, Inc. (hereafter "NaphCare") is a corporation organized under the laws of Alabama and headquartered in Birmingham, Alabama.

50. Defendant NaphCare is amenable to service through a registered agent located in Pima County.

51. In August 2021, Defendant NaphCare and Defendant Pima County entered into a contract for healthcare and substance abuse care at the Pima County Adult Detention Center.

52. Under that contract, Defendant NaphCare was required to provide a range of specified healthcare-related services for approximately one year, starting on September 15, 2021. That contract was in effect during January and February 2022.

53. Under that contract, Defendant NaphCare assumed a contractual responsibility to recruit, hire, train, and supervise approximately 89 full-time equivalent positions including physicians, physician assistants, registered nurses, on-site pharmacists, and other medical providers.

54. Under that contract, Defendant NaphCare was required to recruit, hire, train, and supervise at least one full-time equivalent position titled "substance abuse counselor." That individual or individuals were to be stationed at the Pima County Adult Detention Center during their duty shifts.

55. Under that contract, Defendant NaphCare was required to recruit, hire, train, and supervise at least five additional full-time equivalent positions to provide psychiatry, behavioral health, and/or mental health type services within the Pima County Adult Detention Center.

56. Under that contract, Defendant NaphCare was required to recruit, hire, train, and supervise at least four full-time nurses who were to be devoted primarily to providing detoxification services to detainees.

57. The services that Defendant NaphCare contractually agreed to provide to Defendant Pima County are traditional functions of county government in Arizona. In fact, Pima County utilized public employees to provide similar services within the Pima County Adult Detention Center prior to 2002. Defendant Pima County entered into a contract with Defendant NaphCare in order to fulfil its statutory and constitutional obligations to provide healthcare to pretrial detainees. Consequently, Defendant NaphCare's actions in January and February 2022 were fairly attributable to the county. *See, e.g., West v. Atkins*, 487 U.S. 42, 47 (1988).

58. Defendant NaphCare acted under the color of state law at all relevant times.

59. Defendant NaphCare was a "person" for purposes of 42 U.S.C. § 1983 at all relevant times.

## FACTUAL ALLEGATIONS

### Allegations Related to Staffing Levels

60. During the 12 months leading up to Sylvestre's death, the Pima County Sheriff's Department struggled to maintain constitutionally minimal staffing levels within the Pima County Adult Detention Center.

61. During 2021 and throughout January 2022, the Pima County Adult Detention Center consistently housed between 1,600 and 1,700 detainees per night. During the same time period, however, the number of uniformed corrections officers steadily declined.

62. The Pima County Board of Supervisors provides Defendant Nanos with a budget for approximately 440 full-time uniformed corrections officers at the Pima County Adult Detention Center.

63. Upon information and belief, the number of uniformed corrections officers at the Pima County Adult Detention Center declined as follows:

    a.  In late September 2021, approximately 370 uniformed corrections officers were employed – a shortage of approximately 70.

    b.  In early February 2022, approximately 335 uniformed corrections officers were employed – a shortage of approximately 105.

64. Corrections Sergeant Thomas Frazier observed in December 2021 that: "We cannot effectively run the facility at the low staffing levels." In explaining the situation as it existed in December 2021, Frazier noted that there were not enough corrections officers "to reach minimum staffing on a daily basis," forcing some employees to work 18-hour shifts multiple times a week.

65. Around this same time, corrections officer Carlos Delgado commented that if staffing levels were to decrease from the number then existing in December 2021, "we would not have the bodies to give [detainees] the proper care that they are entitled to."

66. Between the time when Mr. Delgado made the above-described comment and February 1, 2022, the staffing levels further decreased.

67. A contributing factor to this December-to-February staffing decline was a requirement that all corrections officers be vaccinated against COVID-19.

68. In late 2021, the Pima County Board of Supervisors voted to require a subset of Pima County employees to become vaccinated or receive a religious-based or health-based exemption from vaccination.

69. During November and December 2021, both Defendant Nanos and Defendant Pima County (through operation of its Board of Supervisors) communicated to corrections officers that they were subject to the above-described mandate.

70. Under state law, Defendant Nanos is the appointing authority for all uniformed corrections officers.

71. Neither the Pima County Board of Supervisors nor the County Administrator is the appointing authority of uniformed corrections officers at the Pima County Adult Detention Center. *See, e.g., Hounshell v. White*, 220 Ariz. 1, 4 (Ct. App. 2008) ("the county officer—in this case, the Sheriff—is the appointing authority with respect to his or her own deputies and employees.")

72. Consequently, Defendant Pima County (acting through its Board of Supervisors) lacked the legal authority to impose a "vaccinate-or-be-fired" mandate on uniformed corrections officers.

73. Consequently, Defendant Nanos retained the independent authority to decide whether to require COVID-19 vaccinations as a condition of continued employment for uniformed corrections officers.

74. Defendant Nanos exercised that independent authority.

75. Defendant Nanos required all uniformed corrections officers to obtain COVID-19 vaccinations by the first week of January 2022.

76. Defendant Nanos' independent decision to require all uniformed corrections officers to obtain COVID-19 vaccinations was a moving force behind the catastrophically-low staffing levels at the Pima County Adult Detention Center during the months of January and February 2022.

77. Upon information and belief, 17 uniformed corrections officers were terminated during the first week of January 2022 as a result of the vaccination mandate.

78. Upon information and belief, approximately 30-40 additional uniformed corrections officers voluntarily resigned their positions prior to January 1, 2022 as a direct result of the vaccination mandate.

79. The combined effect of the COVID-19 vaccination mandate was to reduce staffing levels at the Pima County Adult Detention Center by approximately 10-15%.

80. This 10-15% reduction was *in addition to* the already dangerously-low staffing levels in existence prior to the vaccine mandate.

81. By late January 2022, the Pima County Adult Detention Center had at least 25% fewer uniformed corrections officers than what was considered to be fully staffed by the Pima County Board of Supervisors.

82. If Defendant Nanos had permitted unvaccinated corrections officers to continue their employment within the Pima County Adult Detention Center, such a policy would not have violated the U.S. Constitution. For example, the Ninth Circuit Court of Appeals

determined that prison administrators acted consistent with the Constitution when they declined to impose a staff vaccine mandate but implemented alternative measures. *Plata v. Newsom*, No. 21-16696, 2022 WL 1210694, at *1 (9th Cir. Apr. 25, 2022).

83. Upon information and belief, the Pima County Adult Detention Center employed approximately 320 corrections officers during late January and early February 2022 when Sylvestre was housed at the Pima County Adult Detention Center. This is roughly 120 corrections officers less than what is traditionally considered to be fully staffed.

84. A pod is a grouping of cells clustered around a pod common area. The Pima County Adult Detention Center was designed to have at least one corrections officer assigned to a pod at all times. Following Sylvestre's death, Defendant Nanos acknowledged that that jail administrators are "setting [officers] up for failure" because "we have one officer for every two or three pods some shifts."[1]

**Allegations Related to Previous Deaths Inside the Pima County Adult Detention Center**

85. Upon information and belief, at least three detainees at the Pima County Adult Detention Center died in custody in 2021 and early 2022 from methamphetamine and opiate overdoses, prior to Sylvestre's death.

86. In May 2021, Justin Crook was found unresponsive in his cell. Toxicology reports indicated that Mr. Crook consumed drugs shortly before his death. Corrections

---

[1] https://news.azpm.org/s/95219-the-buzz-law-enforcement-recruiting-and-shortages-in-southern-arizona/

officers later reported that Mr. Crook's body was cold and stiff when they found him in his cell, suggesting that several hours had elapsed. This, in turn, indicates that corrections officers failed to conduct adequate welfare rounds on the day in question.

87. In October 2021, Jacob Miranda was found unresponsive in his cell. His death was ruled a Fentanyl overdose. Upon information and belief, Mr. Miranda was found hours after he died, again suggesting that corrections officers failed to conduct the necessary welfare rounds.

88. On January 10, 2022, Pedro Xavier Martinez-Palacios was transported to a local hospital after consuming Fentanyl inside the Pima County Adult Detention Center. He died several days later in the hospital. Upon information and belief, corrections officers found him only after irreversible damage occurred, suggesting they had not conducted welfare rounds with adequate frequency.

89. In addition to the three above-described drug overdose deaths, three additional detainees were discovered by corrections officers inside their cell under circumstances that suggest a drug overdose, during the months leading up to Sylvestre's death.

90. Weldon Ellis, Cruz Patino, and William Omegar were all found unresponsive in their jail cell during 2021.

91. The above examples are not exclusive. Every death represents only the most extreme examples of deliberate indifference to a known risk of serious harm. Put differently, the above-described deaths were the proverbial "canary in the coalmine," alerting policymakers and jail administrators to a risk of serious harm.

92. For example, from January 2021 to Feb. 2, 2022, the jail transported 26 detainees to the local hospital on an emergency basis for drug overdoses.

**Allegations Related to Illegal Drugs Found Inside the Jail**

93. On multiple occasions since 2021, Defendant Nanos acknowledged that Fentanyl is finding its way into the Pima County Adult Detention Center.[2]

94. The presence of Fentanyl inside the Pima County Adult Detention Center amounts to a substantial risk of serious harm to those detainees who consume it.

95. According to the U.S. Drug Enforcement Agency and the Department of Health and Human Services, Fentanyl is 50-100 times more potent than morphine. As little as two milligrams, about the size of 5 grains of salt, can cause negative health effects including trouble breathing and dizziness.

96. Upon information and belief, during the months leading up to Sylvestre's death, the Fentanyl and other illegal drugs consumed by detainees inside the Pima County Adult Detention Center primarily arrived to the facility by way of jail employees and/or jail contractors.

97. Upon information and belief, during the months leading up to Sylvestre's death, it was widely known among uniformed corrections officers that there existed a subset of uniformed corrections officers and/or jail contractors who were engaged in smuggling contraband into the Pima County Adult Detention Center for personal profit.

---

[2] See, e.g., "Pima County Jail Faces Scrutiny Amid Decade-High Number of Deaths", Arizona Daily Star, published March 1, 2022 ("it is a tiny pill and sometimes people are going to get that by us. We are doing everything we can to keep that nasty drug out of there. But it is tough.")

98. In the years leading up to Sylvestre's death, there was a documented history of corrections officers smuggling contraband into the jail. For example:

   a. In 2014, former corrections officer Arturo Martinez was charged with smuggling contraband into the jail;

   b. In 2018, former corrections officer Martin Lopez was charged with smuggling narcotics into the jail.

99. During the months leading up to Sylvestre's death, family and friends were not permitted to have in-person, face-to-face visitation with jail detainees. Consequently, no contraband could have entered the facility during those months via civilian visitors to the facility.

100.     During the months leading up to Sylvestre's death, the Pima County Adult Detention Center screened all incoming jail detainees using a full-body scanner designed to detect foreign objects hidden in body cavities.

101.     This scanner takes an image similar to an X-ray. During the first week of its use in late 2017, this particular scanner identified two individuals attempting to smuggle contraband in their body cavities.[3]

102.     The body scanner used by the Pima County Adult Detention Center is similar to that commonly used in airports. However, the body scanner used at the Pima County Adult Detention Center is more powerful than those used in airports.

---

[3] https://apnews.com/article/dc728bd74d6c4f1b99d2bcc1f3da8049

103.    For example, the body scanner used at the Pima County Adult Detention Center will alert its operator when a detainee has a build-up of organic material in his digestive tract as a result of not having had a bowel movement in several days. Consequently, the technology is sensitive enough to detect a small baggie or balloon that has been intentionally swallowed.

104.    Since taking office in January 2021, Defendant Nanos has considered yet declined to implement routine scans of his own employees when they enter the facility at the beginning of a work shift.

105.    On one occasion, for example, Defendant Nanos rejected the idea, saying he worries that searching guards for contraband could be interpreted as infringing on guards' civil rights.

106.    Courts have upheld the broad authority of jail and prison administrators to search any person (visitor, staff, contractor, or arrested or sentenced persons) entering the facility as consistent with the administrator's obligation to maintain a safe and secure environment.

107.    Consequently, upon information and belief, Defendant Nanos maintained an unconstitutional custom and practice of permitting jail personnel to smuggle dangerous narcotics into the facility, thereby creating a substantial risk of serious harm to a large number of detainees who purchased and consumed these narcotics inside the jail.

108.    As a result of this smuggling activity, the already-low number of corrections officers were forced to divert attention away from regular pod rounds in order to address drug-related emergencies.

109.    Upon information and belief, the above-described dynamic results in fewer rounds being conducted. Consequently, when a detainee consumes Fentanyl or other dangerous drugs, there is a greater probability that a corrections officer will pass by their cell for a routine welfare check only after irreversible harm has occurred.

110.    This amounted to an unconstitutional custom or practice because it left a large number of detainees at risk of a substantial risk of serious harm.

111.    Not only did this unconstitutional custom or practice leave substance-dependent detainees vulnerable to serious harm, but it left virtually all pretrial detainees at risk. When an overdose occurred, a corrections officer would be forced to divert his or her attention away from *everyone* else – drug-addicted and non-addicted detainees alike.

**Allegations Related to Sylvestre's Initial Day Inside the Jail**

112.    Sylvestre was arrested on January 27, 2022 and booked into the Pima County Adult Detention Center at approximately 2:00pm.

113.    During the booking process, Sylvestre was required to strip down to his undergarments and give his street clothes to the correctional staff.

114.    During the booking process, Sylvestre was required to remove his shoes and socks.

115.     During the booking process, Sylvestre was required to submit to a full-body scanner as described above.

116.     Sylvestre did not bring Fentanyl pills into the Pima County Adult Detention Center.

117.     At all relevant times, Sylvestre was a pretrial detainee.

118.     At all relevant times, Sylvestre was not serving a criminal sentence.

119.     Within 24 hours, Sylvestre had acquired at least two blue Fentanyl pills from someone within the Pima County Adult Detention Center.

120.     Shortly before 4:00pm on January 28, 2022, a corrections officer was distributing meals to detainees. Upon arriving to the cell where Sylvestre was housed, the corrections officer believed Sylvestre to be asleep on the top bunk.

121.     The officer approached Sylvestre as he was lying on his bunk. The corrections officer noticed that Sylvestre was pale in the face and that he was, in the officer's words, "sweating profusely."

122.     Sylvestre was not responsive when the corrections officer tried to wake him.

123.     The corrections officer called for assistance.

124.     A number of corrections officers and medical personnel arrived to Sylvestre's pod. They administered nine canisters of Narcan to Sylvestre.

125.     Sylvestre regained consciousness and was transported to St. Mary's hospital.

126.     Medical personnel determined that Sylvestre had overdosed on Fentanyl.

127.     In the meantime, corrections staff conducted a search of the jail cell where Sylvestre had been found. Corrections officers found "a small blue pill." At the time, corrections officers recognized that this small blue pill resembled a type of illicit Fentanyl pill then in wide circulation in the community. In particular, the pill found in Sylvestre's cell had a similar size and color to the type of Fentanyl pills in wide circulation within the community.

128.     On or about January 28, 2022, corrections officers prepared reports relating to the small blue pill and the overdose.

129.     Sylvestre remained at St. Mary's Hospital for approximately 24 hours and was stabilized. Sylvestre was then transported back to the Pima County Adult Detention Center.

**Allegations Related to Communication Between NaphCare Personnel and Sheriff's Department Personnel**

130.     Although reports were written about the discovery of the blue Fentanyl pill, there was no readily-available system to allow a corrections officer working during a subsequent shift to know that Sylvestre was suspected of having acquired Fentanyl inside the jail or that he had overdosed.

131.     In January 2022, employees of NaphCare had access to a cloud-based correctional healthcare software program called TechCare. This program allowed medical providers at the Pima County Adult Detention Center to make notes about a detainee's healthcare visits conducted while in custody.

132.     TechCare also allowed healthcare providers employed by NaphCare to track a

detainee's progress and risk factors as it relates to substance abuse.

133.     Upon information and belief, correctional officers were not given access to

TechCare.

134.     Upon information and belief, correctional officers were not trained on how to

access information in TechCare.

135.     The federal Health Insurance Portability and Accountability Act ("HIPAA")

would have permitted the sharing of a detainee's personal health information between

employees of Defendant NaphCare and uniformed officers employed by the Pima

County Sheriff's Department. *See, e.g.,* 45 C.F.R. § 164.512(k) ("a covered entity

may disclose to a correctional institution. . . if the correctional institution or such law

enforcement official represents that such protected health information is necessary

for: [t]he provision of health care to such individuals; [or] [t]he health and safety of

such individual or other inmates").

136.     No law would have prevented Defendant Pima County from requiring that

Defendant NaphCare open its TechCare database to uniformed correctional staff for

the limited purpose of communicating a detainee's heightened risk of substance abuse

and/or history of drug overdoses within the facility.

137.     Because no such policy existed, a corrections officer who did not have

personal knowledge of Sylvestre's January 28 overdose would not have had access to

any government or healthcare-maintained database that would have alerted to this fact.

138.     Because Defendant Pima County is statutorily responsible for detainee healthcare (including substance abuse), it was Pima County's responsibility to ensure that structures and training existed to ensure that NaphCare employees and Pima County Sheriff's Department employees were communicating about a detainee's recent history of in-custody overdoses and acquisition of drugs inside the jail.

139.     Defendant Pima County's failure to put in place such a system amounted to gross negligence.

**Allegations Related to Administrative Lockdown**

140.     Upon returning to the Pima County Adult Detention Center after his hospital stay, Sylvestre was temporarily housed in the jail's infirmary (also called a medical unit or medical pod).

141.     On January 30, 2022, employees of Defendant NaphCare determined that Sylvestre was medically stable enough to leave the infirmary.

142.     Indeed, Sylvestre's condition appears to have improved after January 30. For example, Sylvestre made several lengthy phone calls after being discharged from St. Mary's hospital.

143.     After January 30, Sylvestre was housed in the 2-Delta pod of the Pima County Adult Detention Center.

144.     The 2-Delta pod was on administrative lockdown on February 1, 2022.

145.     Administrative lockdown is distinguished from disciplinary lockdown. During administrative lockdown, an entire jail facility or portion of a jail facility is placed on lockdown for reasons unrelated to discipline. Put differently, administrative lockdown takes place for reasons unrelated to individual detainees' misbehavior.

146.     When a jail facility operates with full staffing, administrative lockdown typically occurs only when there is an adverse incident requiring corrections officers to divert their attention away from their regular duties. For example, jail-wide administrative lockdown may be expected to occur following an inmate-on-inmate assault, during a power surge, or when a pipe breaks.[4] Lockdowns were also frequently utilized prior to the widespread availability of COVID-19 vaccinations as a means of limiting the spread of the virus.

147.     By the time Sylvestre was booked into the Pima County Adult Detention Center in January 2022, jail administrators no longer imposed systemwide administrative lockdowns in order to control the spread of COVID-19. By this time, the COVID-19 vaccine had been available to detainees for almost a full year.

148.     During the months leading up to Sylvestre's death, however, jail administrators regularly relied on administrative lockdown procedures in order to control a different challenge: staffing shortages.

---

[4] *See, e.g.,* "Pima County Jail Placed on Lockdown Due To Broken Pipe," KVOA News, July 30, 2019. Available at: www.kvoa.com/news/local/pima-county-jail-placed-on-lockdown-due-to-broken-pipe/article_7b92334d-0e07-5639-b2fe-d6948da1d8ec.html

149.     During lockdown, a detainee is unable to leave his or her cell to socialize with other detainees in the pod's common area (called the dayroom).

150.     When a jail is understaffed, lockdown procedures help jail staff complete their routine tasks. This is because confining all detainees to their cells for long stretches of time reduces the number of staff hours needed to monitor dayroom time, family visitation time, cafeteria time, and recreation time. For example, corrections officers during lockdown have no need to monitor detainees in the pod's common areas.

151.     In December 2021 – two months before Sylvestre's death – Pima County corrections sergeant Thomas Frazier told reporters that the Pima County Adult Detention Center was experiencing "vast amounts" of what he called "rolling lockdowns."

152.     Lockdown, however, presents its own safety challenges. Because detainees are confined for large stretches of time to their cells, they cannot easily communicate with corrections officers.

153.     For example, the Supreme Court has stated that prison lockdowns "further impede the effective delivery of care" because "staff must either escort prisoners to medical facilities or bring medical staff to the prisoners . . . . put[ting] additional strain on already overburdened medical and custodial staff." *Brown v. Plata*, 563 U.S. 493, 521 (2011).

154.     For example, the Ninth Circuit Court of Appeals observed that prison lockdowns frequently have the effect of "exacerbating" the situation for those

detainees in need of regular medical treatment because during lockdown, "only emergency cases can be seen." *Peralta v. Dillard*, 744 F.3d 1076, 1082 (9th Cir. 2014).

155. When a detainee is housed in a cell during lockdown and does not have a cellmate, there is an even greater risk. For example, if a detainee becomes incapacitated in his cell for whatever reason, there is no cellmate to notice. Without a cellmate, there is no one to yell for immediate attention.

156. For example, it was a cellmate in Summer 2021 who attracted a guard's attention by banging on the cell door when he noticed that Cruz Patino experienced what is believed to have been a drug overdose.[5]

157. Sylvestre was locked in a cell alone for hours on end, mere days after he overdosed on Fentanyl that he had acquired inside the jail. Correctional staff were subjectively aware of these facts when they assigned him to this cell alone.

**Allegations Related to Defendant NaphCare**

158. As described above, Defendant NaphCare entered into a contract with Defendant Pima County in August 2021, with an effective date of September 15, 2021.

159. That contract required Defendant NaphCare to provide 24/7 staffing coverage of certain critical categories of trained staff at the Pima County Adult Detention Center. Among those requirements was that Defendant NaphCare was to provide "at

---

[5] https://perilouschronicle.com/2021/10/15/it-was-a-nightmare-pima-county-jail-deaths-reach-decade-high/

least one LPN to staff a male and female detoxification unit 24 hours a day, seven days a week."

160.    On February 1 and 2, 2022, the 2-Delta Pod was the designated detoxification unit described in the contract between Defendant NaphCare and Defendant Pima County.

161.    Upon information and belief, there was no LPN employed by Defendant NaphCare who was stationed in the 2-Delta Pod between 3:00pm on February 1, 2022 and 6:00am on February 2, 2022.

162.    Upon information and belief, there was no staff person who would be considered an equivalent of an LPN stationed in the 2-Delta Pod between 3:00pm and 6:00am on February 2, 2022.

163.    This failure of NaphCare to staff the 2-Delta Pod with a dedicated LPN on February 1 and 2 amounted to deliberate indifference of serious medical needs, as Defendant NaphCare was subjectively aware that Sylvestre had recently suffered a Fentanyl overdose and could readily access Fentanyl a second time.

164.    Upon information and belief, no staff member from Defendant NaphCare entered Sylvestre's cell between approximately 4:00pm on February 1, 2022 and 5:00am on February 2, 2022.

**Allegations Related to Defendant Montano**

165.      On February 1, 2022, Defendant Montano arrived to the Pima County Adult Detention Center at approximately 3:00pm to start a double shift.

166.      On February 1, 2022, Defendant Montano was assigned to work at the 2-Delta Pod for the first of the two back-to-back shifts.

167.      During Defendant Montano's first shift on February 1, 2022, there were approximately 63 detainees housed on the two levels of the 2-Delta pod. Defendant Montano was the only uniformed corrections officer assigned to the 2-Delta pod during the 3:00pm to 11:00pm shift.

168.      This was the first time that Defendant Montano had worked in the 2-Delta pod.

169.      In Defendant Montano's own words, he was "just barely getting the hang of that pod" on February 1, 2022.

170.      As it existed in early February of 2022, the 2-Delta pod was unique for at least two reasons: 1) the 2-Delta pod was the designated "quarantine" pod, meaning that new arrivals to the jail would be assigned to 2-Delta while their COVID-19 test results were pending; 2) the 2-Delta pod served as the designated place to house "detoxers" – those who were withdrawing from pre-incarceration drug use.

171.      In this sense, the 2-Delta pod housed individuals who were at heightened risk of experiencing adverse medical outcomes.

172.      At 3:00pm on February 1, 2022, Defendant Montano was subjectively aware of the fact that the 2-Delta pod was the designated quarantine and detoxer pod.

173.     Upon information and belief, none of the supervisory staff informed Defendant Montano which of the approximately 63 detainees on his pod were actively detoxing and which of the detainees was there exclusively for COVID-19 quarantine reasons.

174.     Defendant Montano made no effort to learn which of the 63 detainees were detoxers.

175.     On February 1, 2022 from approximately 4:00pm onward, Sylvestre was housed in a cell alone.

176.     When Defendant Montano first observed Sylvestre in 2-Delta Pod between 3:00pm and 4:00pm on February 1, 2022, Defendant Montano took mental note that Sylvestre exhibited the signs traditionally associated with someone who is detoxing.

177.     Defendant Montano strongly suspected that Sylvestre was experiencing the effects of withdrawal.

178.     Defendant Montano did not interact with Sylvestre after about 4:00pm on February 1, 2022.

179.     Defendant Montano subjectively knew starting around 4:00pm on February 1, 2022 that Sylvestre had been assigned to a cell alone, without a cellmate.

180.     Defendant Montano made no effort to re-assign Sylvestre to ensure that he was housed with a cellmate.

181.     Defendant Montano expressed no concern to his supervisors regarding Sylvestre being housed in a cell alone without a cellmate.

182.     Defendant Montano conducted periodic pod rounds between 4:00pm and 10:00pm on February 1, 2022 by walking past Sylvestre's cell. During these pod rounds, Defendant Montano did not speak with Sylvestre or otherwise check to determine whether Sylvestre was responsive.

183.     Upon information and belief, no personnel from Defendant NaphCare entered Sylvestre's cell from 4:00pm through 10:00pm on February 1, 2022 to check on Sylvestre's wellbeing.

184.     Upon information and belief, no other personnel entered Sylvestre's cell between 4:00pm and 10:00pm on February 1, 2022.

185.     Consequently, no one interacted with Sylvestre between 4:00pm and 10:00pm on February 1, 2022. Defendant Montano was aware of this fact in the moment.

186.     Defendant Montano was scheduled to be on-duty until 11:00pm on February 1, 2022 within the 2-Delta pod. For an unknown reason, Defendant Montano left the 2-Delta pod between 10:00pm and 11:00pm.

187.     Defendant Montano's brother also works at the Pima County Adult Detention Center.

188.     Upon information and belief, Defendant Montano's brother was on duty and had supervisory responsibilities on the night of February 1, 2022.

189.     Upon information and belief, Defendant Montano left the 2-Delta Pod before the end of his work shift because his brother invited and/or asked him to report to a different area of the jail prior to 11:00pm.

190.     For an unknown length of time between 10:00pm and 11:00pm on February 1, 2022, there was no coverage within the 2-Delta pod. For a period of time that night, approximately 63 detainees in the 2-Delta pod were locked in their cells without any supervision from uniformed corrections officers.

191.     Defendant Montano's decision to abandon his post, by itself, amounted to deliberate indifference of a substantial risk of serious harm.

**Allegations Related to Defendant Cordero**

192.     On February 1, 2022, Defendant Cordero arrived to the Pima County Adult Detention Center at approximately 11:00pm to start a scheduled shift at the 2-Delta Pod. Defendant Cordero was scheduled to relieve Defendant Montano at 11:00pm.

193.     Defendant Cordero arrived to the 2-Delta Pod and discovered that there was no co-worker to relieve from duty. Defendant Montano was absent from the 2-Delta Pod.

194.     Shortly after starting his work shift at 11:00pm, Defendant Cordero was already experiencing emergencies. Shortly after starting his shift, Defendant Cordero's attention was diverted by the suspected drug overdose of *another* detainee within 2-Delta Pod. For purposes of this complaint, the other detainee is referred to as John Doe.[6]

195.     At approximately 11:10pm on February 1, 2022, a medical emergency alert was triggered for John Doe. During the beginning portion of his work shift, Defendant

---

[6] Undersigned counsel gives this detainee a pseudonym in this complaint because it is unknown whether this individual wishes to be publicly identified.

Cordero tended to John Doe and assisted in coordinating a medical response for John Doe.

196.    During this time, no other corrections officer assisted in conducting pod rounds within the 2-Delta Pod. Consequently, approximately 62 detainees were left without regular supervision while they continued to be locked in their cells.

197.    At this time, Defendant Cordero knew with a high level of certainty that John Doe had acquired drugs within the Pima County Adult Detention Center. This is because John Doe had been detained for at least several days before February 1, 2022, suggesting that he had not gotten high on the outside.

198.    Consequently, between approximately midnight and 5:00am on February 2, 2022, Defendant Cordero was subjectively aware that dangerous drugs were present within the 2-Delta Pod.

199.    After John Doe was transported to the hospital, Defendant Cordero became aware that Sylvestre was among the approximately 63 detainees in the 2-Delta Pod that night.

200.    Defendant Cordero was familiar with Sylvestre's name and was aware that Sylvestre had overdosed days earlier.

201.    Despite this, Defendant Cordero made no effort to confirm that Sylvestre was responsive as he lay on his bunk between midnight and 5:00am. Defendant Cordero observed several times between midnight and 5:00am that Sylvestre was lying on his

bunk, but made no efforts to speak with Sylvestre or to otherwise check on Sylvestre's wellbeing.

202.    Defendant Cordero subjectively knew starting shortly after midnight on February 2, 2022 that Sylvestre had been assigned to a cell alone, without a cellmate.

203.    Defendant Cordero made no effort to re-assign Sylvestre to ensure that he was housed with a cellmate.

204.    Defendant Cordero expressed no concern to his supervisors regarding Sylvestre being housed in a cell alone without a cellmate.

205.    Knowing that John Doe had just overdosed from narcotics he had likely obtained inside the 2-Delta Pod and knowing that Sylvestre himself had acquired narcotics inside the jail just days earlier, Defendant Cordero failed to conduct a cell search (also called cell sweep) of Sylvestre's cell after John Doe was transported to the hospital.

206.    Defendant Cordero failed to ask supervisors to authorize such a search.

207.    Upon information, Sylvestre consumed Fentanyl inside his cell within the 2-Delta Pod between 3pm on February 1 and 3am on February 2.

208.    Upon information and belief, Sylvestre acquired the Fentanyl within the Pima County Adult Detention Center.

209.    Sylvestre died within his cell.

210.    The medical examiner determined Sylvestre's death to be the result of a drug overdose.

## CLAIMS

### COUNT I
### 42 U.S.C. § 1983 – Deliberate Indifference in Violation of the Fourteenth Amendment Due Process Clause
### Against Defendants Cordero, Montano, Kuhn, Rivas-Pardo and NaphCare

211.     The allegations above are incorporated by reference in this Count.

212.     Defendants Cordero and Montano were deliberately indifferent in the manner described above.

213.     Defendants Kuhn and Rivas-Pardo were deliberately indifferent as more fully explained in Count III (failure to intercede/intervene).

214.     Defendant NaphCare was deliberately indifferent by failing to adequately monitor Sylvestre from 4:00pm on February 1, 2022 through 5:00am on February 2, 2022. In particular, Defendant NaphCare was subjectively aware that Sylvestre had recently overdosed on Fentanyl by acquiring a pill or pills inside the jail. In the face of that information, Defendant NaphCare's failure to adequately staff the 2-Delta Pod that night amounted to deliberate indifference. Additionally, Defendant NaphCare was deliberately indifferent in its failure to enter Sylvestre's pod to check on his wellbeing during that same time period.

215.     Under this Count, Plaintiff is entitled to:

    a.   compensatory damages;

    b.   damages for loss of life (also sometimes called hedonic damages);

    c.   damages for pain and suffering of the decedent prior to death; and

d.  punitive damages

## COUNT II
### 42 U.S.C. § 1983 – *Monell*
**Custom or Practice in Violation of the Fourteenth Amendment Due Process Clause**
**Against Defendant Nanos in his official capacity**

216.    The allegations above are incorporated by reference in this Count.

217.    Pima County, through its final policymaker Defendant Nanos, maintained an unwritten custom of maintaining unconstitutionally low staffing levels, as measured on a staff-to-detainee ratio and as measured in light of the unique security challenges present during January and February 2022.

218.    These low staffing levels translated into constitutionally inadequate pod rounds being conducted by uniformed corrections officers.

219.    Pima County, through its final policymaker Defendant Nanos, maintained an unwritten custom of permitting frequent administrative lockdowns, wherein detainees would be locked in their cells for entire 8-hour and 16-hour shifts. This, in turn, increased the risk of detainees dying from serious medical needs.

220.    Pima County, through its final policymaker Defendant Nanos, maintained an unwritten custom of permitting its employees and/or independent contractors to smuggle narcotics into the Pima County Adult Detention Center, thereby creating a substantial risk of harm.

221.    These customs are unconstitutional because they:

    1.  present a substantial risk of serious harm to pretrial detainees;

2.  are deliberately indifferent to the serious medical needs of detainees, like Sylvestre, who were experiencing withdrawal and substance addiction;

222.    Each of these customs was a moving force behind the constitutional violation suffered by Sylvestre.

223.    Under this Count, Defendant is not entitled to the defense of qualified immunity.

224.    Under this Count, Plaintiff is entitled to:

3.  compensatory damages;

4.  damages for loss of life (also sometimes called hedonic damages); and

5.  damages for pain and suffering of the decedent prior to death

**COUNT III**
**42 U.S.C. § 1983 – Fourteenth Amendment**
**Failure to Intervene/Intercede**
**Against Defendants Kuhn and Rivas-Pardo**

225.    The allegations above are incorporated by reference in this Count.

226.    Each of the Defendants named in this Count had an opportunity to intercede (also sometimes referred to as intervene) between the hours of approximately 4:00pm on February 1, 2022 and 4:00am on February 2, 2022.

227.    Defendants were both correctional sergeants within the Pima County Adult Detention Center, with supervisory responsibilities.

228.    Defendants were each on duty during all or a significant portion of the twelve-hour time period described above.

229.     Upon information and belief, as correctional sergeants, Defendants Kuhn and Rivas-Pardo each had the authority to make a cell re-assignment where safety and health indicators suggest that doing so is appropriate or necessary.

230.     Upon information and belief, as correctional sergeants, Defendants Kuhn and Rivas-Pardo each had the authority to assign a cellmate with an appropriate security-level score to a single-housed detainee.

231.     Defendants Kuhn and Rivas-Pardo were subjectively aware on February 1 and 2, 2022 that the 2-Delta Pod was the designated detoxification pod.

232.     Defendants Kuhn and Rivas-Pardo were subjectively aware on February 1 and 2, 2022 that Fentanyl was finding its way into the facility, including into the detoxification pod. Among other things, Defendants knew this because they were subjectively aware that Jacob Miranda in October 2021 and Pedro Xavier Martinez-Palacios on January 10, 2022 had consumed Fentanyl inside the Pima County Adult Detention Center.

233.     Defendants failed to intercede because they failed to stop an ongoing violation of the Fourteenth Amendment Due Process Clause. Specifically, Defendants failed to re-assign Sylvestre to a different location where he would be under closer supervision, failed to conduct pod rounds in 2-Delta Pod themselves when it became clear that other emergencies were preventing Defendants Cordero and Montana from doing so, and failed to insist upon a cell search of Sylvestre's cell after John Doe overdosed earlier in the evening.

234.    In February 2022, this duty to intercede in such circumstances was clearly established within the Ninth Circuit.

235.    Plaintiff is entitled to compensatory and punitive damages under this Count.

**COUNT IV**
**A.R.S. §§ 12-611**
**Wrongful Death (Gross Negligence)**
**Against Defendants Pima County, NaphCare, Cordero, Montano, Kuhn, and Rivas-Pardo**

236.    Plaintiff re-alleges each allegation contained in the above paragraphs.

237.    Under Arizona law, when death of a person is caused by negligence, the persons who would have been liable if death had not ensued, shall be liable in an action for damages.

238.    Defendant Pima County was grossly negligent in failing to ensure proper communication between uniformed correctional officers and employees of Defendant NaphCare, such that a corrections officer might readily know that a given detainee had recently experienced a seriously adverse health outcome. Specifically, because of Defendant Pima County's negligence, there was no system in place for Defendant Montano to know that Sylvestre had overdosed from narcotics obtained within the jail. Similarly, Defendant Pima County failed to require that Defendant Nanos' staff employed systems of internal communication necessary to ensure proper healthcare to detainees within their charge. This failure amounted to a breach of a duty of care within the corrections industry. This failure was a proximate cause of Sylvstre's

death, as it prevented Defendant Montano from knowing that Sylvestre had recently

acquired Fentanyl inside the Pima County Adult Detention Center and therefore

taking appropriate steps during his work shift between 3pm and 11pm on February 1.

As a result of this failure, Sylvestre died.

239.    Defendant Montano breached a duty of care within the corrections industry by

failing to conduct adequate pod rounds during the first several hours of his 3pm work

shift. Within the industry, a pod round requires a corrections officer to make visual

confirmation of each detainee's wellbeing during each pass through the assigned area.

Furthermore, industry standards require that pod rounds be conducted at least twice

per hour in a special population pod such as 2-Delta. Defendant Montano breached

that duty by conducting fewer than two pod rounds per hour during his work shift on

February 1. Defendant Montano further breached that duty by conducting

qualitatively deficient pod rounds by walking past each cell without confirming that

the detainee is breathing.

240.    Defendant Montano breached a duty of care within the industry by abandoning

his assigned duty station before the end of his shift, without arranging for another

corrections officer to replace him and without notifying his chain of command.

Between approximately 10pm and 11pm on February 1, the 2-Delta pod was

completely unstaffed as a result of Defendant Montano's negligence. Upon

information and belief, Sylvestre was in the process of overdosing during this time

period. Defendant Montano's early departure from his assigned duties was a

proximate cause of Sylvestre's death because: 1) it ensured that no pod rounds were conducted during a critical time period; and 2) it increased the work duties heaped upon Defendant Cordero during the first hour of that subsequent work shift, reducing the ability of Defendant Cordero to conduct adequate pod rounds. Sylvestre died as a result.

241.     Defendant Cordero breached a duty of care within the industry by failing to conduct or otherwise order a cell search of Sylvestre's cell between the hours of approximately 1:00am (after the emergency with John Doe concluded) and 5:00am. Defendant Cordero knew that Sylvestre had recently acquired Fentanyl inside the facility days earlier and knew that John Doe had acquired Fentanyl in a nearby cell earlier that same evening. Despite this, Defendant Cordero failed to take adequate action. As a result, Sylvestre was located unresponsive in his cell much later than he would have had Defendant Cordero acted appropriately. As a result, Sylvestre was found too late and died.

242.     Defendant Cordero breached a duty of care within the corrections industry by failing to conduct adequate pod rounds after having delt with the medical emergency presented by John Doe. Within the industry, a pod round requires a corrections officer to make visual confirmation of each detainee's wellbeing during each pass through the assigned area. Furthermore, industry standards require that pod rounds be conducted at least twice per hour in a special population pod such as 2-Delta. Defendant Cordero breached that duty by conducting fewer than two pod rounds per

hour between 1:00am and 5:00am on February 2. Defendant Cordero further breached that duty by conducting qualitatively deficient pod rounds by walking past each cell without confirming that the detainee is breathing. As a result, Sylvestre was found unresponsive much later than he should have been found and died as a result.

243.    Defendants Kuhn and Rivas-Pardo breached a duty of care by failing to order cell searches within the 2-Delta Pod after each of these defendants became aware that John Doe had overdosed on Fentanyl within the 2-Delta pod around 11:00pm on February 1. If cell searches had been conducted between midnight and 5:00am on February 2, Sylvestre would have been found unresponsive in his cell more quickly. This failure is a proximate cause of Sylvestre's death.

244.    Defendants Kuhn and Rivas-Pardo breached a duty of care by failing to assign a greater number of corrections officers to the 2-Delta pod to conduct pod rounds after learning that John Doe had overdosed. Defendants Kuhn and Rivas-Pardo knew that John Doe's overdose put additional strain on Defendant Cordero because Defendant Cordero was required to divert his attention to the emergent medical situation during the first two hours of his work shift. Consequently, inadequate pod rounds were conducted between approximately 11:00pm on February 1 and 1:00am on February 2 while Defendant Cordero was tending to John Doe. Defendants Kuhn's and Rivas-Pardo's failure to supplement this staffing in the 2-Delta Pod was a proximate cause of Sylvestre's death, as Sylvestre was found unresponsive in his cell several hours after he otherwise would have been.

245.     Defendant NaphCare breached a duty of care within the correctional healthcare industry by failing to adequately staff the 2-Delta pod on February 1 and February 2 with medical staff members trained to detect and treat overdose symptoms. As outlined above, Defendant NaphCare did not place any of its staff members in the 2-Delta Pod from approximately 3:00pm on February 1 and 5:00am on February 2. As a result, Sylvestre was not observed by trained medical personnel inside his cell during this time period. Had he been observed by a NaphCare staff person during these hours, he would have been found in his cell hours earlier than he was. As a result, Sylvestre died.

246.     Plaintiff is entitled to compensatory damages under this Count.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that this Court grant her the following relief:

A.  Compensatory damages, including consequential, general, and special damages, in an amount to be determined at trial;

B.  Loss of Life Damages, also called Hedonic damages, as defined by the federal common law and 42 U.S.C. § 1983;

C.  Pain and Suffering damages as permitted under 42 U.S.C. § 1983 (but not under state law);

D.  Punitive damages pursuant to 42 U.S.C. § 1988;

E.  Compensatory damages as allowed in state law;

F.  Attorney's fees under 42 U.S.C. § 1988;

G.  Costs of this action;

H.  Any other relief that this Court deems appropriate.

Respectfully submitted this 28th day of March, 2023 by:

/s Paul Gattone
Paul Gattone
Arizona Bar # 012482
LAW OFFICE OF PAUL GATTONE
301 S. Convent
Tucson, AZ 85701
Email: GattoneCivilRightsLaw@gmail.com
(520) 623-1922
*Attorney for Plaintiff Mariah Inzunza*