**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mariah Inzunza,<br><br>          Plaintiff,<br><br>v.<br><br>Pima County, et al.,<br><br>          Defendants. | No.  CV-22-00512-TUC-SHR<br><br>**Order Re: Doc. 43** |

Plaintiff Mariah Inzunza brought this action through counsel for and on behalf of the estate of her sibling, Sylvestre Miguel Inzunza, IV ("Sylvestre"), and Sylvestre's beneficiaries pursuant to 42 U.S.C. § 1983 and Arizona state law. (Doc. 39.) Defendant Pima County Sheriff Chris Nanos, in his official capacity, filed a Motion to Dismiss *Monell* Claim (Count II) for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Doc. 43.) The Motion is fully briefed. (Docs. 47, 48.)

**I.  Second Amended Complaint**

As relevant to the Motion to Dismiss, Plaintiff alleges the following.

**A.  Sylvestre's Incarceration**

On January 27, 2022, Sylvestre was arrested and booked into the Pima County Adult Detention Center (the "Jail") at approximately 2:00 p.m. (Doc. 39 ¶ 112.) At all relevant times, Sylvestre was a pretrial detainee. (*Id.* ¶ 117.) During the booking process, Sylvestre was required to strip down and submit to a full-body scan; Sylvestre did not bring Fentanyl

pills into the Jail, but within 24 hours he acquired at least two blue Fentanyl pills from someone in the Jail. (*Id.* ¶¶ 113–16, 119.)

On January 28, 2022, shortly before 4:00 p.m., an officer arrived at Sylvestre's cell and believed Sylvestre was asleep on the top bunk but then noticed Sylvestre was pale in the face, sweating profusely, and unresponsive when officers tried to wake him. (*Id.* ¶¶ 120–22.) An officer called for assistance, and nine canisters of Narcan were administered to Sylvestre, who regained consciousness and was transported to St. Mary's hospital. (*Id.* ¶¶ 123–25.) Medical personnel determined Sylvestre had overdosed on Fentanyl. (*Id.* ¶ 126.) Corrections staff searched Sylvestre's cell and found a small blue pill, which officers recognized as resembling a type of illicit Fentanyl pill then in wide circulation in the community. (*Id.* ¶ 127.) Sylvestre was in the hospital for about 24 hours, stabilized, and then transported back to the Jail, where he was housed in the infirmary until January 30, 2022, when the Jail's medical provider determined Sylvestre was stable enough to leave the infirmary. (*Id.* ¶¶ 129, 140–41.)

Sylvestre was then housed in 2-Delta pod, the designated detoxification unit at that time, and as of February 1, 2022, 2-Delta pod was on administrative lockdown. (*Id.* ¶¶ 143–44, 160.) Administrative lockdowns take place for reasons unrelated to a detainee's misbehavior, and Jail administrators regularly relied on administrative lockdown procedures due to staffing shortages. (*Id.* ¶¶ 145, 148.) During lockdowns, detainees are unable to leave their cells to socialize with other detainees in the dayroom, cannot easily communicate with corrections officers, and, if a detainee is housed alone and becomes incapacitated in the cell, there is no cellmate to notice and yell for immediate attention. (*Id.* ¶¶ 149, 152, 155.) Sylvestre was assigned to a cell without a cellmate, mere days after he overdosed on Fentanyl acquired inside the jail, and correctional staff were aware of these facts when they assigned Sylvestre to the cell alone. (*Id.* ¶ 157.)

Upon information and belief, there was no LPN employed by Defendant NaphCare or equivalent staff person stationed in the 2-Delta pod between 3:00 p.m. on February 1,

2022 and 6:00 a.m. on February 2, 2022, and no NaphCare staff member entered Sylvestre's cell during that time. (*Id.* ¶¶ 161–62, 164.)

On February 1, 2022, Defendant Montano, a Corrections Officer (CO), arrived at the Jail around 3:00 p.m. to start a double shift in 2-Delta pod. (*Id.* ¶¶ 165–66.) Montano first observed Sylvestre between 3:00 p.m. and 4:00 p.m., noted Sylvestre exhibited the signs traditionally associated with someone who is detoxing, and strongly suspected Sylvestre was experiencing the effects of withdrawal. (*Id.* ¶¶ 176–77.) Montano did not interact with Sylvestre after about 4:00 p.m. that day, knew Sylvestre was assigned to a cell alone, and made no effort to re-assign Sylvestre to ensure he had a cellmate. (*Id.* ¶¶ 178–180.) Between 4:00 p.m. and 10:00 p.m. that day, Defendant Montano conducted periodic pod rounds and walked past Sylvestre's cell, but Montano did not speak with Sylvestre or otherwise check to determine Sylvestre was responsive. (*Id.* ¶ 182.) Upon information and belief, no other personnel entered Sylvestre's cell between 4:00 p.m. and 10:00 p.m. that day. (*Id.* ¶ 183–84.) For an unknown reason, Defendant Montano left the 2-Delta pod between 10:00 p.m. and 11:00 p.m. on February 1, 2022, and for an unknown length of time between 10:00 p.m. and 11:00 p.m., there was no coverage or any supervision from uniformed COs within the 2-Delta pod, which had approximately 63 detainees locked in their cells. (*Id.* ¶¶ 186–90.)

On February 1, 2022, Defendant CO Cordero arrived at the Jail at 11:00 p.m. to start a scheduled shift in 2-Delta pod and to relieve Defendant Montano, but Cordero discovered there was no one there to relieve. (*Id.* ¶¶ 192–93.) Shortly after 11:00 p.m., Defendant Cordero's attention was diverted by a suspected drug overdose of another detainee (referred to as John Doe) in 2-Delta pod. (*Id.* ¶ 194.) An emergency medical alert was triggered for John Doe, and during this medical emergency, no other CO assisted in conducting rounds within 2-Delta pod, leaving approximately 62 detainees without regular supervision while locked in their cells. (*Id.* ¶¶ 195–96.) Because John Doe had been detained for several days before that night, Defendant Cordero knew John Doe had acquired drugs within the Jail, dangerous drugs were present within the pod, and Sylvestre

had overdosed days earlier. (*Id.* ¶¶ 197–98, 200.) Defendant Cordero observed Sylvestre lying on his bunk several times between midnight and 5:00 a.m., but made no effort to confirm Sylvestre was responsive, to check on his wellbeing, or to speak with Sylvestre. (*Id.* ¶ 201.) Cordero made no effort to re-assign Sylvestre to ensure he had a cellmate, and Cordero did not search Sylvestre's cell after John Doe was transported to the hospital, even knowing John Doe had just overdosed from narcotics likely obtained inside 2-Delta pod and Sylvestre had acquired narcotics inside the jail just days earlier. (*Id.* ¶¶ 203, 205.)

Upon information, Sylvestre consumed Fentanyl inside his cell in 2-Delta pod between 3:00 p.m. on February 1, 2022 and 3:00 a.m. on February 2, 2022. (*Id.* ¶ 207.) Upon information and belief, Sylvestre acquired the Fentanyl within the Jail. (*Id.* ¶ 208.) Sylvestre died in the cell, and the medical examiner determined Sylvestre's death was the result of a drug overdose. (*Id.* ¶¶ 209–210.)

### B. Jail Staffing

During the 12 months prior to Sylvestre's death, the Pima County Sheriff's Department struggled to maintain constitutionally minimal staffing levels within the Jail. (*Id.* ¶ 60.) The Pima County Board of Supervisors provides Defendant Nanos with a budget for approximately 440 full-time uniformed COs at the Jail, but upon information and belief, the number of COs declined from approximately 370 officers in September 2021 to approximately 335 COs in early February 2022, a shortage of approximately 105. (*Id.* ¶¶ 62–63.) Corrections Sergeant Thomas Frazier observed in December 2021, "[w]e cannot effectively run the facility at the low staffing levels," there were not enough COs "to reach minimum staffing on a daily basis," and some employees were forced to work 18-hour shifts multiple times a week. (*Id.* ¶ 64.) CO Carlos Delgado also commented if staffing levels were to decrease from the number existing in December 2021, "we would not have the bodies to give [detainees] the proper care that they are entitled to." (*Id.* ¶ 65.) The staffing levels decreased further after Delgado's comment. (*Id.* ¶ 66.)

Defendant Nanos's independent decision to require all uniformed COs to obtain COVID-19 vaccinations was a moving force behind the catastrophically low staffing levels

at the Jail in January and February 2022. (*Id.* ¶ 76.) Upon information and belief, 17 uniformed COs were terminated during the first week of January 2022 as a result of the vaccination mandate and another 30-40 additional officers voluntarily resigned prior to January 1, 2022 as a direct result of the vaccination mandate. (*Id.* ¶¶ 77–78.) The COVID-19 vaccination mandate reduced staffing levels at the Jail by approximately 10-15% in addition to the already dangerously low staff levels prior to the mandate. (*Id.* ¶¶ 79–80.) By late January 2022, the Jail had at least 25% fewer uniformed COs than the Pima County Board of Supervisors considered to be fully staffed. (*Id.* ¶ 81.) Upon information and belief, the Jail employed approximately 320 COs during late January and early February 2022 when Sylvestre was housed at the Jail, or roughly 120 fewer officers than what is traditionally considered to be fully staffed. (*Id.* ¶ 83.)

Within the Jail, a pod is a grouping of cells clustered around a pod common area, and the Jail was designed to have at least one CO assigned to a pod at all times. (*Id.* ¶ 84.) After Sylvestre died, Defendant Nanos acknowledged jail administrators were "setting [officers] up for failure" because "we have one officer for every two or three pods some shifts." (*Id.*)

**C.    Prior Deaths and Drug Overdoses at the Jail**

Upon information and belief, at least three detainees at the Jail died in custody in 2021 and early 2022, prior to Sylvestre's death, from methamphetamine and opiate overdoses. (*Id.* ¶ 85.) In May 2021, Justin Crooke was found unresponsive, cold, and stiff in his cell, indicating several hours had elapsed and COs failed to conduct adequate welfare rounds that day. (*Id.* ¶ 86.) Toxicology reports indicated Mr. Crooke consumed drugs shortly before his death. (*Id.*) In October 2021, Jacob Miranda was found unresponsive in his cell, and his death was ruled a Fentanyl overdose. (*Id.* ¶ 87.) Upon information and belief, Mr. Miranda was found hours after he died, again suggesting COs failed to conduct the necessary welfare rounds. (*Id.*) On January 10, 2022, Pedro Xavier Martinez-Palacios was transported to a local hospital after consuming Fentanyl inside the Jail, and he died several days later in the hospital. (*Id.* ¶ 88.) Upon information and belief, COs found him

only after irreversible damage occurred, suggesting they had not conducted welfare rounds with adequate frequency. (*Id.*) These three deaths were the proverbial "canary in the coalmine," alerting policymakers and jail administrators to a risk of serious harm. (*Id.* ¶ 91.)

During the months leading up to Sylvestre's death, three other detainees were discovered by COs inside their cells under circumstances suggesting a drug overdose. (*Id.* ¶ 89.) Weldon Ellis, Cruz Patino, and William Omegar were all found unresponsive in their jail cells during 2021. (*Id.* ¶ 90.)

From January 2021 to February 2, 2022, the jail transported 26 detainees to the local hospital on an emergency basis for drug overdoses. (*Id.* ¶ 92.)

**D.     Drugs Found Inside the Jail**

On multiple occasions since 2021, Defendant Nanos acknowledged Fentanyl was finding its way into the Jail and was quoted in a newspaper article dated March 1, 2022, as stating, "it is a tiny pill and sometimes people are going to get that by us. We are doing everything we can to keep that nasty drug out of there. But it is tough." (*Id.* ¶ 93 and n.2.)

Upon information and belief, during the months leading up to Sylvestre's death, the Fentanyl and other illegal drugs consumed by detainees inside the Jail primarily arrived at the facility by way of Jail employees and/or Jail contractors, and it was widely known among uniformed COs there existed a subset of uniformed COs and/or jail contractors who were engaged in smuggling contraband into the Jail for personal profit. (*Id.* ¶¶ 96-97.) In 2014, former CO Arturo Martinez was charged with smuggling contraband into the Jail, and in 2018, former CO Martin Lopez was charged with smuggling narcotics into the Jail. (*Id.* ¶ 98.)

In the months leading up to Sylvestre's death, family and friends were not permitted to have in-person, face-to-face visitation with Jail detainees; consequently, no contraband could have entered the facility during those months via civilian visitors to the facility. (*Id.* ¶ 99.) In the months leading up to Sylvestre's death, all incoming Jail detainees were screened with a full-body scanner designed to detect foreign objects hidden in body

cavities, and the scanner is sensitive enough to detect a small baggie or balloon that has been intentionally swallowed. (*Id.* ¶¶ 102–03.)

Defendant Nanos has considered implementing routine scans of his own employees when they enter the facility at the beginning of a work shift but has declined to do so. (*Id.* ¶ 104.) Although Defendant Nanos has said he worries searching guards could be interpreted as infringing on guards' civil rights, courts have upheld the broad authority of jail and prison administrators to search any person entering the facility, including staff. (*Id.* ¶¶ 105–06.) Upon information and belief, Defendant Nanos maintained an unconstitutional custom and practice of permitting Jail personnel to smuggle dangerous narcotics into the facility, thereby creating a substantial risk of serious harm to a large number of detainees who purchased and consumed these narcotics inside the Jail. (*Id.* ¶ 107.) As a result of this smuggling activity, the already-low number of COs were forced to divert attention away from regular pod rounds to address drug-related emergencies resulting in fewer rounds being conducted and a greater probability a CO will pass by cells for a routine welfare check only after irreversible harm has occurred. (*Id.* ¶¶ 108–09.) When an overdose occurs, a CO is forced to divert their attention away from everyone else—drug-addicted and non-addicted detainees alike. (*Id.* ¶ 111.)

### E. Count Two

Count Two, the subject of Defendant Nanos's Motion to Dismiss, asserts a policy, practice, or custom claim against Defendant Nanos in his official capacity pursuant to *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 690 (1978). Plaintiff alleges that as Pima County's final policymaker, Defendant Nanos maintained an unwritten custom of maintaining unconstitutionally low staffing levels resulting in inadequate pod rounds being conducted by uniformed COs. (Doc. 39 ¶ 217–18.) Plaintiff alleges Defendant Nanos maintained an unwritten custom of permitting frequent administrative lockdowns, wherein detainees would be locked in their cells for entire 8-hour and 16-hour shifts resulting in an increased risk of detainees dying from serious medical needs. (*Id.* ¶ 219.) Plaintiff further alleges Defendant Nanos maintained an

unwritten custom of permitting Jail employees and/or independent contractors to smuggle narcotics into the Jail, thereby creating a substantial risk of harm. (*Id.* ¶ 220.) Plaintiff alleges these customs are unconstitutional because they present a substantial risk of serious harm to pretrial detainees, are deliberately indifferent to the serious medical needs of detainees like Sylvestre, who experience withdrawal and substance addiction, and that each of these customs was a moving force behind the constitutional violation suffered by Sylvestre. (*Id.* ¶ 221.)

## II. Legal Standards

### A. 12(b)(6) Standard

Dismissal of a complaint, or any claim within it, for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) may be based on either a "'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'" *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121–22 (9th Cir. 2008) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)). In determining whether a complaint states a claim under this standard, the allegations in the complaint are taken as true and the pleadings are construed in the light most favorable to the nonmovant. *Outdoor Media Group, Inc. v. City of Beaumont*, 506 F.3d 895, 900 (9th Cir. 2007). A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). But "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what . . . the claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (internal quotation omitted). To survive a motion to dismiss, a complaint must state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

. . . .

. . . .

### B. *Monell* Standard

In *Monell*, the Supreme Court held a local government entity "may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." 436 U.S. at 694; *see Connick v. Thompson*, 563 U.S. 51, 60 (2011) ("local governments are responsible only for their own illegal acts"). A municipality cannot be held vicariously liable for its employees' actions. *Connick*, 563 U.S. at 60 (citations omitted).

"[M]unicipalities may be liable under § 1983 for constitutional injuries pursuant to (1) an official policy; (2) a pervasive practice or custom; (3) a failure to train, supervise, or discipline; or (4) a decision or act by a final policymaker." *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 602–03 (9th Cir. 2019). Where *Monell* liability is based on a policy or custom, a plaintiff must allege several threshold requirements: "(1) that [the plaintiff] possessed a constitutional right of which [s]he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy is the moving force behind the constitutional violation." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011).

"A policy of inaction or omission may be based on failure to implement procedural safeguards to prevent constitutional violations." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012) (citation omitted). In an "omission" case, a plaintiff must show, in addition to a constitutional violation, that the municipality's policy of inaction "amounts to deliberate indifference to the plaintiff's constitutional right, and that the policy caused the violation, in the sense that the municipality could have prevented the violation with an appropriate policy." *Id*. (internal quotations omitted).

### III. Discussion

Defendant Nanos argues Plaintiff's *Monell* claim fails under any of the three alternative theories of alleged unconstitutional customs or practices of (1) permitting Jail

employees and contractors to smuggle dangerous narcotics into the Jail; (2) maintaining low staffing levels; or (3) utilizing frequent administrative lockdowns to control staffing shortages. (Doc. 43 at 7.) Plaintiff responds she has adequately pleaded the existence of two of these customs—narcotics smuggling and understaffing—and these customs were the moving forces being Sylvestre's death. (Doc. 47 at 2.)

Plaintiff does not address Defendants' argument regarding administrative lockdowns. The failure of a represented party to respond to an issue can be deemed a concession to the opposing party's argument resulting in waiver of the issue. *See*, *e.g., Doe v. Dickenson*, No. CV-07-1998-PHX-GMS, 2008 WL 4933964, at *5 (D. Ariz. 2008) ("[t]he Court is entitled to treat Plaintiffs' failure to respond as waiver of the issue and consent to Defendants' argument"); *Currie v. Maricopa Cnty. Cmty. College Dist.*, No. CV-07-2093-PHX-FJM, 2008 WL 2512841, at *2 n.1 (D. Ariz. 2008) ("Plaintiff does not respond to this argument, and her failure to do so serves as an independent basis upon which to grant [the] motion"); LRCiv 7.2(i) (if "the unrepresented party or counsel does not serve and file the required answering memoranda, . . . such non-compliance may be deemed a consent to the denial or granting of the motion and the Court may dispose of the motion summarily").

Because Plaintiff concedes she has not adequately pleaded a *Monell* claim regarding the use of administrative lockdowns, the Court will only address whether Plaintiff has adequately stated a *Monell* claim with respect to the narcotics smuggling and Jail staffing allegations.

### A. Constitutional Injury

Because Sylvestre was a pretrial detainee at the relevant time, his claim arises under the Fourteenth Amendment's Due Process Clause. *See Kingsley v. Hendrickson*, 576 U.S. 389, 391 (2015); *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018); *Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1067–68 (9th Cir. 2016). The governing standard is a purely objective standard. *See Kingsley*, 576 U.S. at 397–99; *Gordon*, 888 F.3d at

1124–25; *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 600, 602 (9th Cir. 2019). Under the Fourteenth Amendment, a pretrial detainee must show:

> (1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;
>
> (2) Those conditions put the plaintiff at substantial risk of suffering serious harm;
>
> (3) The defendant did not take reasonable available measures to abate the risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and
>
> (4) By not taking such measures, the defendant caused the plaintiff's injuries.

*Castro*, 833 F.3d at 1071. "With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily 'turn[] on the facts and circumstances of each particular case.'" *Id.*

Neither party addresses whether Sylvestre suffered a constitutional injury. Plaintiff alleges Sylvestre was placed alone in a cell after suffering a drug overdose, was not sufficiently monitored by Jail COs or medical staff, acquired drugs within the Jail, and because he was not monitored, Sylvestre died in his cell from a Fentanyl overdose. These allegations are sufficient to state a Fourteenth Amendment claim and support the first prong of a *Monell* violation—that Sylvestre suffered a constitutional injury. Next the Court must determine whether Plaintiff has sufficiently alleged this constitutional injury was the result of a custom or policy of allowing drugs to be smuggled into the Jail or from understaffing.

### B. Smuggling Drugs

Plaintiff alleges, upon information and belief, Fentanyl and other illegal drugs "primarily arrived to the facility by way of jail employees and/or jail contractors," it was widely known among COs that there existed a subset of COs and/or jail contractors "who were engaged in smuggling contraband into the [Jail] for personal profit," and there was a "documented history of [COs] smuggling contraband into the jail." Plaintiff alleges two specific instances of Jail employees smuggling items into the Jail. One incident occurred

in 2014, when Plaintiff alleges former CO Martinez was charged with smuggling contraband into the Jail. The other was in 2018, when Plaintiff alleges former CO Lopez was charged with smuggling narcotics into the Jail.

Defendant argues under Arizona law, "contraband" is an extremely broad term that encompasses many things, including dangerous drugs, but also intoxicating liquor, deadly weapons, wireless communication devices, or articles "whose use or possession would endanger the safety, security or preservation of order in a correction facility." (Doc. 43 at 8–9 (quoting Ariz. Rev. Stat. § 13-2501(1)).) Because the definition of "contraband" is so broad, Defendant argues Plaintiff has only alleged one example of an employee smuggling narcotics into the Jail, and that occurred in 2018. (*Id.*)

Plaintiff responds the Second Amended Complaint provides extensive support to infer Jail employees were responsible for smuggling narcotics into the Jail at the time Sylvestre died. (Doc. 47 at 3.) Plaintiff argues her allegations eliminate the possibility dangerous drugs were entering the Jail through visitors or detainees and that Defendant Nanos refused to implement screens of his own employees. (*Id.*)

The two instances of staff being charged with smuggling contraband and drugs into the Jail in 2014 and 2018 are too distant in time from Sylvestre's death to establish a policy, pattern, or practice. Likewise, Plaintiff's allegations it was widely known among COs that there was a subset of COs and/or jail contractors "who were engaged in smuggling contraband into the [Jail] for personal profit," is vague and unsupported by any specific allegation supporting this was common knowledge. But Plaintiff alleges in the four months prior to Sylvestre's death in February 2022, there were two detainee deaths in the Jail caused by Fentanyl and a third death in May 2021 in which a detainee died from a drug overdose. Plaintiff further alleges in 2021, the year before Sylvestre died, 26 detainees were taken from the Jail to the hospital for drug overdoses, including three detainees whom Plaintiff names. This number of deaths and overdoses from drugs, including Fentanyl, in the year prior to Sylvestre's death provided notice of a problem with illicit drugs in the Jail. Plaintiff's allegations detainees were thoroughly searched via body scans and no in-person

visits to detainees were allowed in the months prior to Sylvestre's death supports that detainees and visitors were not bringing illicit drugs into the Jail and further supports the inference that the only other individuals entering the Jail—Jail staff and/or contractors—were the likely source of illicit drugs. The allegations Defendant Nanos considered, but declined, to subject incoming Jail employees and contractors to a search supports the inference of a policy of inaction to address a likely, potential source of drugs coming into the Jail. The alleged failure to address the frequent overdoses and deaths in the Jail from illicit drugs by declining to screen a potential source of those drugs supports the inference this policy of inaction was deliberately indifferent to the health and safety of the detainees in the Jail and was the moving force behind Sylvestre's death.

Accordingly, Plaintiff has sufficiently stated a *Monell* claim in Count Two based on the alleged smuggling of drugs into the Jail by Jail staff and/or contractors.

### C. Low Staffing Levels

Plaintiff alleges although the Pima County Board of Supervisors budgeted for 440 full-time uniformed COs at the Jail, by the time Sylvestre was incarcerated there in February 2022, there were only 335 COs. Plaintiff alleges even in September 2021, before the vaccine mandate, there were only 370 COs. Plaintiff quotes corrections staff as saying in December 2021, for example, that "We cannot effectively run the facility at the low staffing levels" and that there were not enough COs "to reach minimum staffing on a daily basis." Plaintiff also quotes Defendant Nanos as stating, after Sylvestre's death, jail administrators were "setting [officers] up for failure" because "we have one officer for every two or three pods some shifts."

While these allegations of low staffing levels are concerning, Plaintiff has not sufficiently alleged Sylvestre's death was the result of a custom or policy of inadequate staffing. That is because Plaintiff alleges Defendant Montano made periodic rounds between 4:00 p.m. and 10:00 p.m. on February 1, 2022, and walked past Sylvestre's cell during those rounds, but Montano did not speak with Sylvestre or otherwise check to determine Sylvestre was responsive. Plaintiff further alleges between midnight and 5:00

a.m. on February 2, 2022, Defendant Cordero observed Plaintiff several times lying on his bunk, but Cordero made no efforts to confirm Sylvestre was responsive, to check on Sylvestre's wellbeing, or to speak with Sylvestre. These allegations support that Sylvestre's death was attributable to individual Defendants Montano and Cordero's actions or inactions, and not that low staffing levels were the moving force behind Sylvestre's death.

Accordingly, Plaintiff fails to state a *Monell* claim related to alleged inadequate staffing.

**IT IS ORDERED** Defendants' Motion to Dismiss *Monell* Claim (Count II) (Doc. 43) is **GRANTED IN PART AND DENIED IN PART** as set forth in this Order.

**IT IS FURTHER ORDERED** Defendants shall file their Response to Plaintiff's Second Amended Complaint no later than 14 days from this Order.

Dated this 15th day of November, 2023.

Honorable Scott H. Rash
United States District Judge