**WO**                                                                  MGD

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

Mariah Inzunza,                                    No. CV-22-00512-TUC-SHR

              Plaintiff,

v.                                                 **ORDER**

Pima County, et al.,

              Defendants.

Plaintiff Mariah Inzunza brought this action through counsel for and on behalf of the estate of her sibling, Sylvestre Miguel Inzunza, IV ("Sylvestre"), and Sylvestre's beneficiaries pursuant to 42 U.S.C. § 1983 and Arizona state law based on Sylvestre's death while he was incarcerated in the Pima County Adult Detention Center (the "Jail"). Before the Court is a Motion for Summary Judgment filed by Defendants Pima County, Pima County Sheriff Chris Nanos, Corrections Officers (COs) Saul Montano and Humberto Cordero, and Sergeants Antonio Rivas-Pardo and Sean Kuhn (collectively, "County Defendants") (Doc. 103), which Plaintiff opposes (Doc. 121). Also before the Court is Defendant NaphCare Incorporated's Motion for Summary Judgment (Doc. 105), to which Plaintiff did not file a response, and Defendant NaphCare's Request for Ruling on its Unopposed Motion for Summary Judgment (Doc. 128).[1]

---

[1] Because Plaintiff did not file a response to Defendant NaphCare's Motion, the Court, by Order dated July 3, 2025, stated NaphCare's Motion shall be considered uncontested and its supporting Statement of Facts (Doc. 106) shall be treated as undisputed unless the Court grants Plaintiff leave to file a late response. (Doc. 124.) To date, Plaintiff

## I.     Background

Plaintiff asserts the following claims in the Second Amended Complaint (Doc. 39):

- Count One: Fourteenth Amendment deliberate indifference against Defendants Cordero, Montano, Kuhn, Rivas-Pardo and NaphCare;

- Count Two: policy, practice, or custom claim against Defendant Nanos pursuant to *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 690 (1978);

- Count Three: Fourteenth Amendment Failure to Intervene/Intercede against Defendants Kuhn and Rivas Pardo;

- Count Four: Wrongful Death (Gross Negligence) pursuant to Arizona Revised Statutes § 12-611 against Defendants Pima County, NaphCare, Cordero, Montano, Kuhn, and Rivas-Pardo.

County Defendants move for summary judgment on Counts One through Four. (Doc. 103.)  Plaintiff states in her Response that she opposes County Defendants' Motion as to Count One, pertaining to Defendants Montano and Cordero, and as to Count Four, pertaining to Defendants Montano, Cordero, and Rivas-Pardo.  (Doc. 121 at 1.)  Plaintiff's Response does not address County Defendants' Motion regarding Counts Two and Three or her claims against Defendants Kuhn, Nanos, or Pima County.  (*See* Doc. 121.)

## II.    Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts

has not sought leave to file a late response.

1    to the nonmovant to demonstrate the existence of a factual dispute and that the fact in

2    contention is material, *i.e.*, a fact that might affect the outcome of the suit under the

3    governing law, and that the dispute is genuine, *i.e.*, the evidence is such that a reasonable

4    jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S.

5    242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th

6    Cir. 1995).  The nonmovant need not conclusively establish a material issue of fact in its

7    favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968); however,

8    it must "come forward with specific facts showing that there is a genuine issue for trial,"

9    *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal

10   citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

11        At summary judgment, the judge's function is not to weigh the evidence and

12   determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*,

13   477 U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence and draw

14   all inferences in the nonmovant's favor.  *Id.* at 255.  The court need consider only the cited

15   materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).

16   **III.    Facts**

17        **A.    Defendant NaphCare's Drug Screening Process for Detainees at the Jail**

18        Pima County contracts with NaphCare to provide comprehensive healthcare

19   services at the Jail.  (Doc. 106 (Def. NaphCare's Statement of Facts) ¶¶ 44–45.)  NaphCare

20   was not responsible for drug interdiction, strip searches, cell searches, or detainee welfare

21   checks.  (*Id.* ¶ 46.)  NaphCare was not responsible for performing rounds or welfare checks

22   on detainees; rather, correctional officers performed the welfare checks.  (*Id.* ¶ 47.)

23   NaphCare staff did not have authority to and could not perform cell checks.  (*Id.* ¶ 48.)

24        Per NaphCare policy, if a patient manifests opioid intoxication or withdrawal

25   symptoms, a NaphCare medical provider places that patient on Clinical Opiate Withdrawal

26   Scale ("COWS") monitoring, commonly referred to as "detox" or the "detox dashboard,"

27   and may prescribe comfort medications.  (*Id.* ¶ 6.)  A COWS assessment is a commonly

28   used tool to assess a patient's opiate withdrawal symptoms, analyzing the severity of 11

common withdrawal symptoms.  (*Id.* ¶ 7.)  A NaphCare nurse scores the patient on each symptom based on its severity, and the total of each symptom score is added together, creating a COWS range of 0–48, with higher scores indicating a more severe opioid withdrawal.  (*Id.* ¶ 8.)  Under the policy in place at the time of the incident involving Sylvestre, NaphCare nurses would perform person-to-person COWS assessments about every 8 hours on patients being monitored.  (*Id.* ¶ 9.)  A NaphCare provider may additionally prescribe a Buprenorphine taper to help alleviate a patient's withdrawal symptoms if the patient's COWS scores are greater than or equal to 6 and more than 12 hours had passed since the patient's last opioid use.  (*Id.* ¶ 10.)

A NaphCare medical provider or provider designee could remove a patient from COWS monitoring under the following conditions: the individual had been on the detox dashboard a minimum of 72 hours; the individual did not have a currently prescribed Buprenorphine taper; the individual had not used comfort medication for nausea, vomiting, or diarrhea over the last 24 hours; the individual had COWS scores less than 4 during 3 consecutive assessments, meaning almost no withdrawal symptoms; and the individual had passed the Columbia-Suicide Severity Rating Scale within 24 hours of removal from the dashboard.  (*Id.* ¶ 11.)

If a detainee is found overdosing, NaphCare policy requires, among other things, responding medical personnel to provide the detainee with naloxone (Narcan), check vital signs, and deliver oxygen.  (*Id.* ¶ 12.)

**B.    Sylvestre's Booking into the Jail**

Sylvestre was arrested and booked into the Jail on January 27, 2022.  (Doc. 104 (County Defs.' Statement of Facts) ¶ 1.)

Before entry into the Jail, NaphCare employee and EMT Morgan Hixson performed a pre-booking screening to medically clear Sylvestre for confinement.  (Doc. 106 ¶ 1.) During the pre-booking screening, which consisted of a physical assessment and health-related questions, Sylvestre demonstrated he could walk without assistance and speak without slurred or altered speech.  (*Id.* ¶ 2.)  Sylvestre also denied having recently taken

illegal drugs, general drug/alcohol use and abuse, and any immediate health needs or problems. (*Id.* ¶ 3.)

After being medically cleared for confinement, NaphCare Nurse Nancy Perez performed a receiving screening of Sylvestre to identify his medical needs while in the Jail. (Doc. 106 ¶ 4.) As part of this screening process, Nurse Perez screened Sylvestre to identify whether he was at risk for withdrawing or overdosing. (*Id.* ¶ 5.) During his initial screening with Nurse Perez on January 27, 2022, Sylvestre did not appear disoriented to person, place, time, or situation; was not intoxicated or withdrawing; and was not exhibiting in any way an altered mental state. (*Id.* ¶ 13.) Nurse Perez also documented Sylvestre denied recent drug or alcohol use, being prescribed medications, and having a history or risk of alcohol or drug withdrawal. (*Id.* ¶ 14.)

### C.    Sylvestre's First Overdose

On January 28, 2022, Sylvestre was discovered unresponsive when dinner was delivered to his cell. (Doc. 104 ¶ 2.) Sylvestre was revived by Jail and medical staff and transported to St. Mary's Hospital. (*Id.* ¶ 3.) A small blue pill later determined to be fentanyl was discovered in a face mask during a search of Sylvestre's cell. (*Id.* ¶¶ 4–5.) NaphCare did not prescribe Sylvestre the fentanyl on which it was determined he had overdosed. (Doc. 106 ¶¶ 15–16.) NaphCare and Jail personnel provided Sylvestre 9 doses of Narcan and saved his life. (*Id.* ¶ 17.)

Sylvestre was discharged from the hospital about 4 hours after he arrived, and when he returned to the Jail, he was housed in the infirmary on detox protocol. (Doc. 104 ¶¶ 6–7; Doc. 106 ¶ 19.) NaphCare Nurse Kathleen Richey assessed Sylvestre and reviewed the discharge instructions from the hospital, which indicated Sylvestre should follow up with his primary care physician. (Doc. 106 ¶ 20.) Sylvestre was alert and in no apparent distress, and his vitals were within normal limits. (*Id.*) Nurse Richey sent an alert to a provider and scheduled a follow-up appointment per St. Mary's discharge instructions. (*Id.* ¶ 21.) Later that day, Nurse Richey also performed an Initial Admission Assessment. (*Id.* ¶ 22.) Sylvestre denied medical or mental health issues and denied being a danger to

1    himself or others, and Nurse Richey encouraged Sylvestre to make his needs known and

2    move around, and reminded him how to request medical, mental health, or dental care,

3    which Sylvestre stated he understood.  (*Id.* ¶¶ 23–25.)

4         Pursuant to Nurse Richey's provider alert, NaphCare Nurse Practitioner Travis

5    Prescott ordered a urine drug screen, placed Sylvestre on COWS monitoring, prescribed

6    comfort medications, and ordered a Buprenorphine taper to begin if Sylvestre's COWS

7    scores became greater than 6 and 12 hours had passed since his last use of opioids.  (Doc.

8    106 ¶ 26.)  Sylvestre had his first COWS assessment on January 29, 2022, at about 4:21

9    a.m., and he presented with a COWS score of 4.  (*Id.* ¶ 27.)  Over the next 3 days, Sylvestre

10   had 8 additional COWS assessments—scoring 3 or less in each—and 3 additional

11   assessments—including one clearing him from infirmary care by the medical director, for

12   a total of 11 assessments.  (*Id.* ¶ 28.)

13        Sylvestre continually had negative suicide screenings, denied nausea, vomiting, and

14   diarrhea, denied medical concerns, and had a COWS score of 1 or less during his last 3

15   screenings prior to discharge from detox.  (Doc. 106 ¶ 29.)  In the early morning of

16   February 1, 2022, Sylvestre was removed from COWS monitoring and the detox board

17   after having satisfied the requirements for removal from detox care.  (*Id.* ¶ 30.)  NaphCare

18   is responsible for determining whether to place a detainee on or remove a detainee from

19   detox protocol, and NaphCare removed Sylvestre from detox protocol on February 1, 2022,

20   at 6:32 a.m.  (Doc. 104 ¶¶ 11–12.)  Sylvestre's removal from the detox board complied

21   with NaphCare's policies and procedures.  (Doc. 106 ¶ 31.)  After his removal from detox,

22   and because Sylvestre denied any medical concerns, NaphCare personnel were no longer

23   medically monitoring Sylvestre on a daily basis.  (*Id.* ¶ 32.)  Sylvestre did not request any

24   further medical treatment after his removal from detox protocol on February 1, 2022.  (*Id.*

25   ¶ 39.)

26        **D.    Sylvestre's Move to Pod 2-Delta**

27        On February 1, 2022, Defendant Correctional Officer (CO) Montano was assigned

28   to work the swing shift from 3:00 p.m. to 11:00 p.m. in Pod 2-Delta, which was on

lockdown during Montano's entire shift.  (Doc. 104 ¶¶ 13–14.)  When a pod is on lockdown, the cell doors are locked and detainees are unable to leave their cells.  (*Id.* ¶ 15.)  During lockdown, rounds are performed every 30 minutes per the Jail's regulations.  (*Id.* ¶ 16.)

According to the Pima County Sheriff's Department "Rounds Report" for February 1, 2022, Montano conducted his first round at 5:00 p.m. on February 1, 2022—two hours after the start of his shift.  (Doc. 122 at 12 ¶ 15; Doc. 104-1 at 10.)  During his 8-hour shift in Pod 2-Delta, Defendant Montano logged 6 rounds—an average of one round every 80 minutes.  (Doc. 122 at 12 ¶ 16; Doc. 104-1 at 10.)  The last round logged by Montano in the computer system was at 8:27 p.m., and the last round Montano "was captured to have conducted" was at 10:30 p.m.—approximately 2 hours apart.  (Doc. 122 at 12 ¶ 17, citing, in part, Doc. 104-1 at 10 and County Defs.' video Exhibit E.)  After Sylvestre's death, command staff determined Montano had failed to conduct adequate rounds every 30 minutes within Pod 2-Delta on February 1, 2022.  (Doc. 122 at 13 ¶ 20.)

On February 1, 2022, Defendant Montano was aware Pod 2-Delta served a dual purpose as a detox/quarantine pod and was aware some of the detainees in Pod 2-Delta were experiencing withdrawal symptoms.  (Doc. 122 at 11 ¶ 10.)  On February 1, 2022, Defendants Montano and Cordero both understood dual role detoxer/quarantine pods had heightened risks and demanded more staffing resources compared to general population pods.  (*Id.* ¶ 11.)  During the months prior to Sylvestre's death, Defendants Montano and Cordero understood the Jail to be understaffed and, on account of understaffing, some COs were forced to work overtime and lockdowns were ordered with greater frequency.  (*Id.* ¶ 12.)

On February 1, 2022, Defendant Montano escorted Sylvestre from the sally-port to his cell between 3:00 and 4:00 p.m., and Montano recalls Sylvestre was not on the list of detainees who were detoxing.  (Doc. 104 ¶¶ 17–18.)  Montano could tell when a detainee was "withdrawing from something" based on that person's general appearance and demeanor.  (Doc. 122 at 11 ¶ 9.)  When Montano was escorting Sylvestre to his cell,

Montano noted Sylvestre's appearance and demeanor was consistent with that of a detoxer. (*Id.* ¶ 14.)

During rounds, COs walk by every cell and look in the window to check on the safety and security of detainees. (Doc. 104 ¶ 45.) Plaintiff does not dispute this is what COs are supposed to do but disputes this statement to the extent it asserts Defendants Montano and Cordero always did so during pod rounds. (Doc. 122 at 5 ¶ 45.) Although Montano testified that during rounds, he peers through the window long enough to confirm body or chest movements of a detainee who appears to be sleeping, he also testified that if the detainee is sleeping under a blanket, he cannot see their chest moving up and down. (*See* Doc. 122 at 13 ¶¶ 23–24; Doc. 127 at 5.)

Plaintiff asserts in the pod round conducted by Defendant Montano at 10:30 p.m. on February 1, 2022, Montano can be seen looking in the direction of Sylvestre's cell window for a maximum of one second—not long enough to determine if Sylvestre was breathing or making body movements and not long enough to make a full observation. (Doc. 122 at 14 ¶ 26, citing, in part, County Defs.' video Ex. E.) County Defendants dispute this as "pure speculation as to what Montano could or could not see when conducting his rounds, especially when a detainee was covered by a blanket." (Doc. 127 at 6.)

Defendant Montano was the only CO assigned to work in Pod 2-Delta during the 3:00 p.m. to 11:00 p.m. shift on February 1, 2022. (Doc. 122 at 14 ¶ 27.) There was no other CO in Pod 2-Delta when Montano left his shift on February 1, 2022, around 10:45 p.m. (*Id.* ¶ 28; Doc. 104 ¶ 22.) Montano left Pod 2-Delta before the end of his scheduled work shift without informing any co-workers or supervisors and without obtaining authorization. (Doc. 122 at 12 ¶ 18.) At the time Defendant Montano left Pod 2-Delta prematurely, the detainees in Pod 2-Delta were locked in their cells and there was no other CO available to monitor their wellbeing. (*Id.* at 13 ¶ 19.)

Defendant CO Cordero was assigned to work the night shift in Pod 2-Delta on February 1, 2022, from 11:00 p.m. to 7:00 a.m., and Cordero arrived in Pod 2-Delta at

11:01 p.m. on February 1, 2022.  (Doc. 104 ¶¶ 24–25.)  Defendant Cordero was the only CO scheduled to monitor Pod 2-Delta on the night of February 1, 2022, going into the morning of February 2, 2022.  (Doc. 122 at 15 ¶ 33.)  Typically, COs receive a briefing when they arrive to start their shift for the purpose of communicating any emergent issues with detainees and jail conditions, but due to staffing shortages on February 1, no such briefing occurred during the 11:00 p.m. shift change on that date.  (*Id*. at 11 ¶ 13.)

Shortly after Defendant Cordero arrived in Pod 2-Delta, a nurse doing detox rounds discovered an unresponsive detainee ("John Doe") in Cell 8, and a medical emergency was called.  (Doc. 104 ¶¶ 26–27.)  Cordero assisted with the unresponsive detainee, Defendant Sergeant Rivas-Pardo provided CPR, and Defendant CO Kuhn was "only on the radio." (*Id.* ¶¶ 27–28, 30.)

As a supervisor, it was Defendant Rivas-Pardo's practice to order another CO to conduct a round during a medical emergency or conduct a round himself.  (*Id.* ¶ 31.)  Jail surveillance video shows a round being conducted during a medical emergency in Pod 2-Delta around 11:27 p.m.[2]  (Doc. 104-2 at 92 ¶ 5.)  On February 1, 2022, Defendants Cordero and Rivas-Pardo did not know Sylvestre had overdosed in the Jail several days earlier.[3]  (*Id.* ¶¶ 36–37.)

No contraband was found during a search of John Doe or his cell (Cell 8).  (Doc. 104 ¶ 33.)  The Jail did not have the ability to conduct a search of the entire Pod 2-Delta during the night shift, and a pod search would have required 12–15 officers and taken at least 2 hours.  (*Id.* ¶¶ 38–39.)  According to County Defendants' correctional expert, Ed

---

[2] County Defendants do not state who conducted that round.

[3] Plaintiff does not dispute these facts in his Controverting Statement of Facts (*see* Doc. 122 at 4 ¶¶ 36–37), but, in his Separate Statement of Facts, Plaintiff contends "[e]ven though Sylvestre's name was not on the list of so-called 'detoxers,' Defendant Cordero was subjectively aware Sylvestre was a detoxer during his shift beginning at 11pm on February 1, 2022."  (*See id*. at 15 ¶ 34.)  Plaintiff cites to the Medical Examiner's report, which does not mention Cordero by name, and it is not clear what in that report supports Plaintiff's assertion Cordero was subjectively aware Sylvestre was a detoxer.  (*See* Doc. 104-3 at 40.)  Therefore, Plaintiff's apparent dispute is unsupported by the evidence cited.

Sweeney, similarly situated custody staff would not have conducted a search of Sylvestre's cell immediately following John Doe's medical emergency absent a particularized suspicion, and there was no apparent reason for any of the County Defendants to have searched Sylvestre's cell at that time or increased the number of officers assigned to Pod 2-Delta after another detainee in the pod was found unresponsive. (*Id.* ¶¶ 34–35.) Despite there being K-9 units present at the Jail, no drug-sniffing dogs were called to sniff for any illicit substances in Pod 2-Delta after John Doe's overdose on February 1, 2022. (Doc. 122 at 16 ¶ 37.)

Due to John Doe's medical emergency, Defendant Cordero conducted his first safety round in Pod 2-Delta at 11:42 p.m. and every 20 minutes thereafter throughout the night.[4]  (Doc. 104 ¶ 40.)

Defendant Cordero recalled that, during the night and into the early morning hours of February 2, 2022, Sylvestre had appeared to be sleeping with a blanket over his head, which is common for detainees to do, especially in February when it is cold.  (Doc. 104

---

[4] Plaintiff does not dispute that Cordero performed his first pod round at 11:42 p.m. or that Cordero used the computer system to log pod rounds approximately every 20 minutes thereafter, instead disputing whether Cordero actually conducted those pod rounds after 11:42 p.m. on February 1, 2022.  (Doc. 122 at 4 ¶ 40.)  Plaintiff cites only the Pima County Medical Examiner's report, which does not mention Cordero by name and generally states that, "Per Sgt. Brown with the Pima County Sheriff's Office, [Sylvestre] was last known to be alive at 2200 hours on 02/01/2022.  He was on withdrawal protocol, and therefore was not checked on between then and when he was found unresponsive because the jail staff 'let them sleep it off' when detainees are on withdrawal protocol." (Doc. 104-3 at 40.)  This vague report does not mention Cordero by name or explain what "checked on" means and therefore does not support Plaintiff's contention Cordero did not conduct and log his rounds throughout the night.

County Defendants object to the Medical Examiner's report as inadmissible hearsay. (*See* Doc. 127 nn. 4, 6–7, 10–12.)  Defendants' argument is without merit because Plaintiff may rely on material in a form not admissible in evidence to oppose summary judgment, so long as that material could be produced in an admissible form at trial.  *See Quanta Indemnity Co. v. Amberwood Dev. Inc.*, No. CV 11-1807-PHX-JAT, 2014 WL 1246144, at *2 (D. Ariz. March 26, 2014) (citing cases) (material in a form not admissible in evidence, but which could be produced in a form admissible at trial, may be used to avoid, but not obtain summary judgment).

¶¶ 42–43.)  If a detainee appears to be sleeping during the night, COs do not wake them if there is no reason to think they are in medical distress.  (*Id.* ¶ 47.)  When Cordero entered Sylvestre's cell to deliver breakfast around 5:00 a.m. on February 2 and found Sylvestre unresponsive, Sylvestre still had a blanket over his head.  (*Id.* ¶¶ 48–49.)  Cordero called for medical assistance, officers responded and started administering CPR, and Cordero administered Narcan.  (*Id.* ¶¶ 50–51.)  NaphCare nurses responded to the scene and attempted life saving measures, but, despite their efforts, Sylvestre was pronounced dead by Tucson Fire and Rescue.  (Doc. 106 ¶ 52.)

CO Reynaldo Montes de Oca was delivering food in nearby Pod 2C when he heard a call for medical assistance in reference to Sylvestre's drug overdose.  (Doc. 122 at 16 ¶ 38.)  CO Montes de Oca told investigators on the scene a nurse had asked if Sylvestre was detoxing, and somebody said he was.  (*Id.* ¶ 39.)

When Sylvestre was discovered lifeless on the morning of February 2, everyone who interacted with his body described it as cold and so stiff that his "arms were in a fixed position."  (*Id.* ¶ 40.)  Forensic investigator Arden Mower noted in her post-incident report submitted later in the day on February 2 that rigor mortis had set in.  (*Id.* ¶ 41.)  When Captain Keefe of the Tucson Fire Department arrived at Pod 2-Delta and examined Sylvestre's body, Captain Keefe declined to pronounce a time of death because Keefe "was of the opinion that Sylvestre had been deceased for some time and [Keefe] would be simply guessing."  (*Id.* ¶ 42.)

The medical examiner determined Sylvestre's cause and manner of death was accidental acute fentanyl intoxication.  (Doc. 104 ¶ 52.)  Homicide detectives brought in to investigate Sylvestre's death during the morning of February 2, 2022, were told the guards had been letting Sylvestre "sleep it off," and the final pod round confirming Sylvestre's wellbeing took place at 10:00 p.m. on February 1.  (Doc. 122 at 16 ¶ 36.)

Sylvestre did not have a cellmate during CO Montano and Cordero's shifts on February 1–2, 2022, and it was not unusual for Sylvestre to be housed alone.  (Doc. 104 ¶¶ 53–54.)  Defendants' expert, Sweeney, opined County Defendants had not acted

1    improperly when they assigned and continued to house Sylvestre in a cell without a

2    cellmate, and neither the National Commission on Correctional Health Care (NCCHC) nor

3    the American Correctional Association (ACA) has any standard recommending double

4    celling a detainee who may be detoxing or who had previously overdosed on drugs.  (*Id.*

5    ¶ 55.)  Plaintiff disputes this to the extent Defendant Montano testified, based on his own

6    training and experience, he believes having a cellmate can improve safety.  (Doc. 122 at 6

7    ¶ 55.)

8         Plaintiff has never disclosed an expert to provide an opinion in this case and has

9    admitted the care Defendant NaphCare provided Sylvestre complied with the standard of

10   care required of a jail medical provider.  (Doc. 106 ¶ 59.)  NaphCare's disclosed expert,

11   Dr. Thomas Minahan, opined NaphCare's policy regarding Medically Assisted Treatment

12   of Opioid Withdrawal and Intoxication, including overdose care, and treatment of Sylvestre

13   was appropriate and complied with the standard of care of jail medical providers.  (*Id.*

14   ¶ 61.)  Dr. Minahan also opined NaphCare appropriately trained, hired, supervised,

15   directed, and instructed its staff; NaphCare staff provided care within the standard of care;

16   and NaphCare and its staff did not contribute to Sylvestre's death.  (*Id.* ¶ 63.)  Plaintiff

17   admitted NaphCare's Medically Supervised Withdrawal Process is constitutional,

18   Sylvestre had been appropriately removed from the detox protocol, and afterwards,

19   NaphCare had no authority to constantly monitor Sylvestre or enter his cell.  (*Id.* ¶¶ 62,

20   64–65.)

21        The NCCHC standards dictate confidential health records stored in correctional

22   facilities are to be maintained under secure conditions separate from correctional records,

23   and the ACA's Performance Based Standards for Adult Local Detention Facilities state

24   "information about an inmate's health status is confidential" and "[t]he active health record

25   is maintained separately from the confinement case record."  (Doc. 104 ¶¶ 59–60.)  In the

26   experience and opinion of County Defendants' expert Sweeney, it would be contrary to

27   national corrections standards for medical staff to discuss individual medical treatments or

28   diagnoses with custodial staff.  (*Id.* ¶ 61.)

Another of County Defendants' experts is Dr. Ly, a Professor of Emergency Medicine at the University of San Diego School of Medicine who specializes in the fields of medical toxicology and emergency medicine and routinely treats patients with exposure to drugs. (Doc. 104 ¶ 62.) According to Dr. Ly, fentanyl and other narcotics depress the central nervous system, inducing drowsiness, stupor, and unconsciousness, and when the central nervous system is depressed, intoxicated patients will experience varying degrees of sedation and even coma. (*Id.* ¶¶ 63–64.) Dr. Ly asserts "[t]o a lay observer without medical training, unconsciousness and coma may be very difficult to distinguish from typical sleep particularly if the observer is not at the bedside." (*Id.* ¶ 65.) Dr. Ly further asserts "[t]he most lethal effects of opioids involve the respiratory system by depressing respiratory rate and depth including apnea." (*Id.* ¶ 66.) Detection of mild to moderate respiratory depression is difficult by observation alone, even by trained medical personnel, without formally examining the individual and assessing respiratory rate, respiratory depth, or using more sophisticated medical monitoring devices. (Doc. 104 ¶ 67.) Dr. Ly opines it "is highly unlikely that typical COs have the medical sophistication to appreciate respiratory insufficiency by simply looking into a jail cell from outside the cell." (*Id.* ¶ 68.)

Defendant Montano did not have any medical training beyond providing CPR, and Defendants Cordero and Rivas-Pardo did not have any medical training beyond providing Narcan and CPR. (Doc. 104 ¶¶ 69–71.)

### E. Contraband Detection in the Jail

Jail rules prohibit possession of contraband, which is defined to include illicit drugs such as fentanyl, and state and federal law also prohibit possession of fentanyl. (Doc. 104 ¶¶ 72–73.) Detainees regularly attempt to smuggle contraband into the Jail, and between July and December of 2021, there were 60 incidents of detainees caught by Intake Unit Jail staff attempting to smuggle in drug paraphernalia, 33 of which involved fentanyl. (*Id.* ¶¶ 74–75.) In those incidents, contraband was found in the following locations: pants pocket, inside bra, under breast, vaginal cavity, anal cavity, under tongue, behind testicles, and "ingested," among others. (*Id.* ¶ 76.)

In January 2022, the Jail used full-body scanning devices to screen all incoming detainees for contraband. (Doc. 104 ¶ 77.) Fewer than half of the nation's jails currently have body scanners, which are very expensive. (*Id.* ¶ 78.) In addition, the Jail is among a small percentage of jails that have invested in and utilize drug sniffing dogs to help locate illegal drugs inside the facility. (*Id.* ¶ 79.) Although body scanners help prevent contraband from coming into the Jail, they are not 100% effective. (*Id.* ¶ 82.) The scanners are effective at identifying contraband in a subject's clothing or affixed to their body, but detecting non-metallic foreign objects or substances inside the body is much more challenging and, even with this advanced technology, identifying contraband is not foolproof: only if a foreign body is protruding from a body cavity would it be relatively easy to identify. (*Id.* ¶ 83.) Depending on how it is packaged and where it is located, contraband in a body cavity may be indistinguishable on a scanning device image from a buildup of fecal matter and some other naturally occurring substances. (*Id.* ¶ 84.) The body scanners at the Jail are not foolproof, and it is very possible Sylvestre himself brought fentanyl into the Jail.[5] (Doc. 104 ¶ 88; Doc. 122 at 8 ¶ 88.)

Defendant Sheriff Nanos is not aware of any correctional staff, Naphcare personnel, or vendors bringing drugs into the Jail, or of any Jail employee providing drugs to detainees. (Doc. 104 ¶¶ 91–94.) During the past four years, only detainees have been found bringing contraband into the Jail. (*Id.* ¶ 97.)

Body scanners like those used at the Jail generate ionizing radiation, and federal OSHA regulations require employers to protect workers from routine exposure to ionizing radiation sources. (Doc. 104 ¶¶ 100–01.) Correctional expert Sweeney is not aware of any correctional facility at the local, state, or federal level requiring staff to pass through ionizing radiation body scanner devices before starting their workday. (*Id.* ¶ 103.)

---

[5] Plaintiff disputes Sylvestre could have brought drugs into the Jail after being screened at intake, but the evidence he cites is a Jail document showing Sylvestre's location in the Jail, which says nothing about drugs or screening for contraband. (*See* Doc. 122 at 8 ¶ 88, citing Doc. 104-1 at 8.)

1    **IV.    Discussion**

2        **A.    Counts One and Three (Fourteenth Amendment)**

3        Plaintiff asserts Count One (Fourteenth Amendment deliberate indifference) against

4    Defendants Cordero, Montano, Kuhn, Rivas-Pardo, and NaphCare and Count Three

5    (Fourteenth Amendment Failure to Intervene/Intercede) against Defendants Kuhn and

6    Rivas-Pardo.

7        "Pretrial detainees are entitled to 'adequate food, clothing, shelter, sanitation,

8    medical care, and personal safety.'" *Alvarez-Machain v. United States*, 107 F.3d 696, 701

9    (9th Cir. 1996) (quoting *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982)).   To

10   establish a deprivation of Fourteenth Amendment rights, a plaintiff must show defendants

11   were objectively and deliberately indifferent to that right.   *Gordon v. County of Orange*,

12   888 F.3d 1118, 1124−25 (9th Cir. 2018).   Unlike in the Eighth Amendment context, where

13   a showing of subjective deliberate indifference is required, a plaintiff need not show

14   subjective intent to establish a constitutional violation.   *Id.* at 1125.

15       The elements of a pretrial detainee's Fourteenth Amendment claim against an

16   individual defendant are:

17
18               (i) the defendant made an intentional decision with respect to
                 the conditions under which the plaintiff was confined;

19               (ii) those conditions put the plaintiff at substantial risk of
20               suffering serious harm;

21               (iii) the defendant did not take reasonable available measures
                 to abate the risk, even though a reasonable official in the
22               circumstances would have appreciated the high degree of risk
                 involved—making the consequences of the defendant's
23               conduct obvious; and

24               (iv) by not taking such measures, the defendant caused the
                 plaintiff's injuries.
25

26   *Id.*   "With respect to the third element, the defendant's conduct must be objectively

27   unreasonable, a test that will necessarily 'turn[] on the facts and circumstances of each

28   particular case.'"   *Id.* (quoting *Castro v. County of Los Angeles*, 833 F.3d at 1071 (9th Cir.

2016)).

The "'mere lack of due care by a state official' does not deprive an individual of life, liberty, or property under the Fourteenth Amendment." *Castro*, 833 F.3d at 1071 (quoting *Daniels v. Williams*, 474 U.S. 327, 330–31 (1986)). A plaintiff must "prove more than negligence but less than subjective intent—something akin to reckless disregard." *Id.*

In their Motion, County Defendants set forth the legal standards for state law negligence and Fourteenth Amendment deliberate indifference claims together and primarily discuss the elements of a negligence claim. (*See* Doc. 103 at 9–13.) County Defendants argue that because there was no duty to assign Sylvestre a cellmate, search Sylvestre's cell after the medical emergency involving another detainee, or to ensure "proper" communication between custody and medical staff, Plaintiff's negligence claim fails, and if the conduct complained of is not even negligent, then it cannot be deliberately indifferent. (*Id.* at 11.) As to the § 1983 claim, County Defendants alternatively argue Montano and Cordero are entitled to qualified immunity. (*Id.* at 19–21.) Despite County Defendants' combined briefing, the Court will discuss the Fourteenth Amendment and negligence claims separately and will turn first to the merits of Plaintiff's Fourteenth Amendment claim.

### 1.    Defendants Montano and Cordero

Here, there can be no dispute Defendants Montano and Cordero made intentional decisions with respect to the conditions under which Sylvestre was confined by leaving him in a locked cell from approximately 3:00 p.m. on February 1 until Sylvestre was found unresponsive around 5:00 a.m. on February 2 when breakfast was delivered. By the time Sylvestre was discovered, his body was cold and stiff, and Captain Keefe of the Tucson Fire Department declined to pronounce a time of death because Keefe was of the opinion Sylvestre had been deceased for some time, creating questions of fact as to when, and during whose shift, Sylvestre died.

In addition, there is a disputed issue of material fact as to whether Defendant Montano adequately monitored Sylvestre during his shift and whether that inadequate

monitoring put Sylvestre at substantial risk of suffering serious harm.  For example, the evidence reflects Montano, the only CO in Pod 2-Delta during his shift, logged 6 rounds during his eight-hour shift, not 16 as the regulations require, and Montano left his shift early, without anyone monitoring Pod 2-Delta in his absence.  In addition, the evidence reflects command staff determined Montano failed to conduct adequate pod rounds within Pod 2-Delta on February 1, 2022.

Plaintiff's claim falters, however, on the issue of causation.  Plaintiff must show that by not taking reasonably available measures, Defendants Cordero and Montano caused Sylvestre's injuries.  County Defendants argue Plaintiff has produced no evidence as to what these Defendants could have or should have observed from outside Sylvestre's cell on their rounds that would have triggered them to seek medical attention for Sylvestre.  (Doc. 103 at 17, citing Doc. 104 ¶¶ 104–06, 42, 49.)  They argue that if the COs were to check for breathing, they lacked the medical training or equipment to know whether that breathing was sufficient, and there is no evidence either Defendant could have determined through observation that Sylvestre, who was under a blanket, was either in respiratory distress or had stopped breathing.  (*Id*. at 17–18.)

The evidence reflects Sylvestre's head was covered by a blanket throughout the night, and Plaintiff does not dispute Defendants' evidence that if a detainee appears to be sleeping during the night, the COs are not going to wake them if there is no reason to think they are in medical distress.  Plaintiff has not presented any evidence either Defendant Montano or Cordero had reason to think Sylvestre was in medical distress.   While Defendant Montano may have testified Sylvestre's appearance and demeanor was consistent with that of a detoxer, it is not clear what that means, and it is undisputed Sylvestre was not on the list of detainees in the pod who were detoxing, and there is no evidence either Defendant Montano or Cordero actually knew Sylvestre had recently overdosed.

While the possible failure to follow Jail regulations on conducting rounds was, at a minimum, negligent, the record evidence fails to show that either Defendant Montano or

1    Coredero performed their duties with reckless disregard to Sylvestre's wellbeing. *See*
2    *Castro*, 833 F.3d at 1071 ("'mere lack of due care by a state official' does not deprive an
3    individual of life, liberty, or property under the Fourteenth Amendment" (quoting *Daniels*,
4    474 U.S. at 330–31).

5    Accordingly, the Court will grant summary judgment in favor of Defendants
6    Montano and Cordero as to Plaintiff's Fourteenth Amendment claim in Count One.[6]

7                    **2.      Defendants Kuhn and Rivas-Pardo**

8    It is undisputed Defendant Kuhn was "on the radio" during the emergency related
9    to John Doe on February 1, 2022. (Doc. 104 ¶ 30; Doc. 122 at 4 ¶ 30.) It is also undisputed
10   Defendant Rivas-Pardo, who "responded to the emergency with John Doe" on February 1,
11   2022, did not know Sylvestre had overdosed in the Jail and been revived several days
12   before his fatal overdose, did not have any medical training beyond CPR and Narcan, and
13   was not aware of any Jail employee or contractor bringing illicit drugs into the Jail. (Doc.
14   104 ¶¶ 29, 31, 37, 71, 96; Doc. 122 at 4, 7, 8 ¶¶ 29, 31, 37, 71, 96.) There are no other
15   facts presented regarding Defendants Kuhn and Rivas-Pardo.

16   Based on these undisputed facts, County Defendants have met their initial burden
17   of showing neither Defendant Kuhn nor Rivas-Pardo was objectively deliberately
18   indifferent to Sylvestre's wellbeing. Plaintiff must therefore cite to evidence creating a
19   genuine issue of material fact Defendants Kuhn and Rivas-Pardo engaged in conduct that
20   was objectively deliberately indifferent and resulted in the violation of Sylvestre's
21   constitutional rights. Plaintiff does not assert any facts about these Defendants in her own
22   Separate Statement of Facts or address their involvement at all in her Response.[7] (*See* Doc.
23   122 at 9–17; Doc. 121.)

24

25   _____

26   [6] Because the Court will grant summary judgment to Defendants Montano and
     Cordero on the merits, the Court need not address whether they are entitled to qualified
27   immunity.

28   [7] The only Defendants Plaintiff substantively addresses in her Response are
     Defendants Montano and Cordero.

To the extent Plaintiff is suing Defendants Kuhn and Rivas-Pardo in their roles as supervisors, there is no respondeat superior liability under § 1983, and, therefore, a defendant's position as the supervisor of persons who allegedly violated a plaintiff's constitutional rights is not a basis for liability. *Monell*, 436 U.S. 658; *Hamilton v. Endell*, 981 F.2d 1062, 1067 (9th Cir. 1992); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). "Because vicarious liability is inapplicable to § 1983 suits, a plaintiff must prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). However, a supervisor may be liable "if he or she was personally involved in the constitutional deprivation or a sufficient causal connection exists between the supervisor's unlawful conduct and the constitutional violation." *Lemire v. Cal. Dep't of Corrs. and Rehab.*, 726 F.3d 1062, 1074–75 (9th Cir. 2013) (quoting *Lolli v. County of Orange*, 351 F.3d 410, 418 (9th Cir. 2003)). Supervisory liability is direct liability, which requires the plaintiff to show a supervisor breached a duty to the plaintiff and was the proximate cause of the injury. *Id.*

Plaintiff has not presented any evidence showing either Defendant Kuhn or Rivas-Pardo was personally involved in a deprivation of Sylvestre's constitutional rights or there was a sufficient causal connection between their conduct and a constitutional violation. Because there is no genuine dispute of material fact that Defendants Kuhn and Rivas-Pardo violated Sylvestre's rights, the Court will grant summary judgment as to these Defendants on Plaintiff's Fourteenth Amendment claims in Counts One and Three.

### 3.   Defendant NaphCare

To support a § 1983 claim against a private entity performing a traditional public function, such as providing medical care to prisoners, the evidence must support the prisoner's constitutional rights were violated as a result of a policy, decision, or custom promulgated or endorsed by the private entity. *See Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138–39 (9th Cir. 2012) (extending the "official policy" requirement for municipal liability under *Monell*, 436 U.S. at 691, to private entities acting under color of law). Under *Monell*, a plaintiff must show: (1) he suffered a constitutional injury; (2) the entity had a

policy or custom; (3) the policy or custom amounted to deliberate indifference to the plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional injury. *See Monell*, 436 U.S. at 691–94; *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110–11 (9th Cir. 2001).

Defendant NaphCare argues Plaintiff only asserted a Fourteenth Amendment claim against NaphCare in Count One and did not assert a *Monell* claim against NaphCare, as required, even though Plaintiff did assert a *Monell* claim against Defendant Sheriff Nanos in Count Two. (Doc. 105 at 8–9.) For that reason alone, NaphCare argues it is entitled to summary judgment as to Count One and, even if Plaintiff had properly pleaded a *Monell* claim, there is no evidence NaphCare had a policy or custom amounting to deliberate indifference to Sylvestre's constitutional right or was the moving force behind the constitutional injury. (*Id*. at 9–13.)

Plaintiff did not respond to Defendant NaphCare's Motion for Summary Judgment, and NaphCare's facts are undisputed. NaphCare has met its initial burden at summary judgment of presenting evidence Sylvestre had been discharged from NaphCare's care when he overdosed on fentanyl a second time and there is no evidence NaphCare or its personnel supplied the fatal dose of fentanyl to Sylvestre or was aware he was overdosing before he was found in his cell at 5:00 a.m. Therefore, Plaintiff is obligated to demonstrate the existence of a factual dispute and that the fact in contention is material. Plaintiff has not presented any evidence that NaphCare had a policy or custom that amounted to deliberate indifference to Sylvestre's constitutional right or that the policy or custom was the moving force behind a constitutional injury to Sylvestre. The Court will grant summary judgment to NaphCare on Plaintiff's Fourteenth Amendment claim in Count One.

## B.    Count Two (*Monell* Claim)

Count Two asserts a policy, practice, or custom claim against Defendant Nanos in his official capacity pursuant to *Monell*. Defendant Nanos previously moved to dismiss this claim (Doc. 43), and by Order dated November 15, 2023, the Court dismissed the portions of the claim relating to low staffing levels and administrative lockdowns, leaving

only Plaintiff's claim relating to Jail employees and/or contractors allegedly smuggling drugs into the Jail. (Doc. 52.)

Local government entities are considered "person[s] acting under color of state law" who can be sued under § 1983. *Monell*, 436 U.S. at 690. However, as discussed, there is no respondeat superior liability under § 1983. Therefore, to maintain a claim against Defendant Sheriff Nanos, Plaintiff must meet the test articulated in *Monell*, and Defendant Nanos may only be held liable under § 1983 for his employees' civil rights deprivations if Plaintiff can show an official policy or custom caused the constitutional violations. *Monell*, 436 U.S. at 694. If the policy or custom in question is an unwritten one, Plaintiff must show it is so "persistent and widespread" that it constitutes a "permanent and well settled" practice. *Id.* at 691 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68 (1970)). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996); *Connick v. Thompson*, 563 U.S. 51, 61 (2011) ("Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law.")

County Defendants argue Defendant Nanos is entitled to summary judgment on the drug smuggling allegations because there is no evidence to support Jail staff were the source of illicit drugs in the Jail and not Jail detainees. (Doc. 103 at 21.) They argue is it undisputed detainees regularly attempt to bring contraband into the Jail, in the last six months of 2021, there were 60 incidents of detainees caught attempting to smuggle drugs and drug paraphernalia into the Jail, 33 of which involved fentanyl, and no evidence has been disclosed of a single instance where Jail staff, medical staff or vendors smuggled drugs into the Jail. (*Id.* at 23–24.) County Defendants assert Plaintiff did not respond to Defendant Nanos' written discovery requests for all evidence supporting the *Monell* allegations. (*Id.* at 24.)

County Defendants have met their initial burden, and Plaintiff fails to present evidence showing a dispute of material fact. Accordingly, the Court will grant summary judgment in favor of Defendant Nanos on Count Two.

### C.    Count Four (Wrongful Death/Gross Negligence)

Plaintiff asserts a Wrongful Death/Gross Negligence claim pursuant to Arizona Revised Statutes § 12-611 against Defendants Pima County, NaphCare, Cordero, Montano, Kuhn, and Rivas-Pardo.

Arizona's wrongful death statute states "[w]hen death of a person is caused by wrongful act, neglect or default, and the act . . . is such as would, if death had not ensued, have entitled the party injured to maintain an action to recover damages in respect thereof," the person responsible for the alleged negligence or default "shall be liable to an action for damages." Ariz. Rev. Stat. § 12-611. Under Arizona law, plaintiffs are typically required to show public employees are "grossly negligent" and not merely negligent. *See* Ariz. Rev. Stat. § 12-820.02 (providing qualified immunity to a public employee acting within the scope of employment unless the public employee "intended to cause injury or was grossly negligent").

To prevail on a negligence claim under Arizona law, a plaintiff must prove: "(1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach by the defendant of that standard; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual damages." *Gipson v. Kasey*, 150 P.3d 228, 230 (Ariz. 2007) (internal citations omitted). Additionally, a gross-negligence claim "requires a showing of '[g]ross, willful, or wanton conduct.'" *Noriega v. Town of Miami*, 407 P.3d 92, 98 (Ariz. Ct. App. 2017) (quoting *Armenta v. City of Casa Grande*, 71 P.3d 359, 364 (Ariz. Ct. App. 2003) (other citation omitted). "A party is grossly or wantonly negligent if he acts or fails to act when he knows or has reason to know facts which would lead a reasonable person to realize that his conduct not only creates an unreasonable risk of bodily harm to others but also involves a high probability that substantial harm will result." *Walls v. Ariz. Dep't of Pub. Safety*, 826 P.2d 1217, 1221 (Ariz. Ct. App. 1991). "Gross or wanton

or willful misconduct negligence is different from ordinary negligence in quality and not degree.  A person can be very negligent and still not be guilty of gross negligence." *Kemp v. Pinal County*, 474 P.2d 840, 843–44 (Ariz. Ct. App. 1970).  It is "action or inaction with reckless indifference to the result or the rights or safety of others." *Williams v. Thude*, 885 P.2d 1096, 1104 (Ariz. Ct. App. 1994).  "Generally, whether gross negligence occurred is a question of fact for a jury to determine." *Noriega*, 407 P.3d at 101 (explaining "gross negligence need not be established conclusively, but the evidence on the issue must be more than slight and may not border on conjecture") (quoting *Walls*, 826 P.2d at 1221).

### 1.    Defendants Montano and Cordero

#### a.    Duty and Standard of Care

It is well established a duty exists when "the relationship of the parties [is] such that the defendant [is] under an obligation to use some care to avoid or prevent injury to the plaintiff." *Markowitz v. Ariz. Parks Bd.*, 706 P.2d 364, 368 (Ariz. 1985), *superseded by statute on other grounds as recognized in Maher v. United States*, 56 F.3d 1039, 1042 n.4 (9th Cir. 1995); *Grafitti-Valenzuela ex rel. Grafitti v. City of Phoenix*, 167 P.3d 711, 715 (Ariz. Ct. App. 2007).  Arizona has recognized a duty to protect exists in certain special relationships such as guardian-ward and jailer-prisoner.  *Fedie v. Travelodge Int'l, Inc.*, 782 P.2d 739, 741 (Ariz. Ct. App. 1989); *Markowitz*, 706 P.2d at 368; *see also Minneci v. Pollard*, 565 U.S. 118, 128 (2012) (noting California's tort law regarding a jailer's duty of care to protect prisoners from harm "reflects general principles of tort law present, as far as we can tell, in the law of every State").

The Arizona Supreme Court has recognized that, in cases where deputies take custody of someone, the deputies have a duty to protect that person against unreasonable risk of physical harm.  *Fleming v. State Dep't of Pub. Safety*, 352 P.3d 446, 448 (Ariz. 2015).  And "[t]he duty to protect the other against unreasonable risk of harm extends to . . . risks arising from pure accident, or from the negligence of the plaintiff [her]self . . . ." *Id.* (quoting Restatement (Second) of Torts § 314A cmt. D); *see DeMontiney v. Desert Manor Convalescent Ctr. Inc.*, 695 P.2d 255, 260 (Ariz. 1985)).  Thus, Defendants had a

duty to prevent Sylvestre from injuring himself.

County Defendants argue Defendants Montano and Cordero had no duty to express concern to their supervisors Sylvestre was housed alone and their expert, Ed Sweeney, opined there was no duty for any of the County Defendants to intercede and change Sylvestre's housing assignment. (Doc. 103 at 10.) As to any duty to search Sylvestre's cell after John Doe experienced a medical emergency early in Defendant Cordero's shift, they argue there is no evidence Defendant Cordero had any particularized suspicion that would cause him to search Sylvestre's cell, Sylvestre was not on detox protocol, and Cordero was not aware Sylvestre had experienced an overdose several days earlier. (*Id*. at 11–12.) Plaintiff does not actually address the applicable duty/standard of care in her Response. (*See* Doc. 121.)

As to whether Defendants Montano and Cordero sufficiently monitored Sylvestre during their shifts, "the standard of care to be applied in a negligence action focuses on the conduct of a reasonably prudent person under the circumstances." *SW Auto Painting and Body Repair, Inc. v. Binsfeld*, 904 P.2d 1268, 1272 (Ariz. Ct. App. 1995). In many cases, "it is not necessary for the plaintiff to present evidence to establish the standard of care because the jury can rely on its own experience in determining whether the defendant acted with reasonable care under the circumstances." *Bell v. Maricopa Med. Ctr.*, 755 P.2d 1180, 1182 (Ariz. Ct. App. 1988) (citation omitted). Here, the Jail had regulations establishing, at a minimum, how often COs were to conduct rounds and observe detainees in their care. A reasonably prudent person under the circumstances would understand a CO at the Jail had a duty to conform to those regulations.

As to Plaintiff's allegation in the First Amended Complaint that Defendant Cordero had a duty to search Sylvestre's cell after another detainee had overdosed that night, Plaintiff has not presented any evidence to counter defense expert Sweeney's opinion that similarly situated custody staff would not have searched Sylvestre's cell absent a particularized suspicion, and there is no evidence in the record that Defendant Cordero had any particularized suspicion that would cause him to search Sylvestre's cell. Although

1   Plaintiff contends Cordero knew Sylvestre had overdosed on fentanyl a few days earlier,

2   the only evidence Plaintiff cites—the Medical Examiner's report—does not support

3   Cordero had this knowledge.  Therefore, the evidence does not support Cordero had a duty

4   to search Sylvestre's cell.

5                                  **b.    Breach**

6       A "duty is breached when conduct falls below the standard of ordinary care by

7   creating an unreasonable risk of harm to the plaintiff."  *Chavez v. Tolleson Elem. School*

8   *Dist.*, 595 P.2d 1017, 1020 (Ariz. Ct. App. 1979) (citations omitted).  "If reasonable men

9   would differ as to the breach of a duty, the question becomes one for the jury based upon

10  the evidence."  *Id.*

11      County Defendants argue Plaintiff failed to respond to their discovery request about

12  how Montano's and Cordero's rounds were deficient, and Plaintiff has produced no

13  evidence as to what these Defendants could have or should have observed from outside

14  Sylvestre's cell on their rounds that would have triggered them to seek medical attention.

15  (Doc. 103 at 17, citing Doc. 104 ¶¶ 104–06, 42, 49.)  They argue even if the COs were to

16  check for breathing, they lacked the medical training or equipment to know whether that

17  breathing was sufficient, and there is no evidence either Defendant could have observed

18  Sylvestre, who was under a blanket, was either in respiratory distress or had stopped

19  breathing.  (*Id*. at 17–18.)

20      Plaintiff responds a reasonable jury could conclude Defendants Montano and

21  Cordero breached their duty by failing to monitor Sylvestre and failing to communicate

22  with coworkers.  (Doc. 121 at 23.)  Plaintiff argues Montano and Cordero "had several

23  hours to properly calibrate and adjust their approach before Sylvestre likely expired."  (*Id*.

24  at 24.)

25      Plaintiff does not cite evidence in the record supporting these arguments or explain

26  precisely what she means by "failing to monitor Sylvestre and failing to communicate with

27  co-workers."  Presumably, she is referring to a failure to conduct scheduled rounds and

28  Montano's failure to communicate to Cordero his observation Sylvestre had the appearance

of someone detoxing.

Nevertheless, even taking the evidence in the light most favorable to Plaintiff, the evidence supports at most negligence, not gross negligence, which requires Defendants Montano and Cordero to have acted "with reckless indifference to the result or the rights or safety of" Sylvestre. *Williams*, 885 P.2d at 1104. The evidence reflects Sylvestre appeared to be asleep with his head covered by a blanket, was not on the list of detoxers, and died of acute fentanyl intoxication. Therefore, even if he had the appearance of someone detoxing, the effects of detoxing were not the cause of death. Even if Defendants Montano and Cordero were negligent in conducting their rounds, there are no facts to suggest they knew or had reason to know anything that "would lead a reasonable person to realize that his conduct not only creates an unreasonable risk of bodily harm to others but also involves a high probability that substantial harm will result." *Walls*, 826 P.2d at 1221.

Nevertheless, the Court is mindful that whether gross negligence occurred is generally a question of fact for a jury to determine, *Noriega*, 407 P.3d at 101, and the Court will proceed to determine whether there is a question of fact regarding causation.

### c.    Causation

A plaintiff must show some reasonable connection between a defendant's act or omission and the plaintiff's injury. *Robertson*, 789 P.2d at 1047. "The proximate cause of an injury is that which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces an injury, and without which the injury would not have occurred." *Id.* (quoting *McDowell v. Davis*, 448 P.2d 869, 871 (Ariz. 1968)). "The defendant's act or omission need not be a large or abundant cause of the injury; even if defendant's conduct contributes only a little to plaintiff's damages, liability exists if the damages would not have occurred but for that conduct." *Id.* (internal quotation marks omitted).

County Defendants argue Plaintiff cannot show their alleged grossly negligent acts proximately caused Sylvestre's death because his death was determined to be acute fentanyl intoxication from self-administered fentanyl and was determined to be an

accident.  (Doc. 103 at 14.)  They contend after Defendant Montano escorted Sylvestre to his cell between 3:00 and 4:00 p.m., Montano conducted periodic rounds in Pod 2-Delta, with his last round at 10:30 p.m., and Cordero also conducted periodic rounds every 20 minutes during his shift and Sylvestre appeared to be asleep during those rounds.  (*Id*. at 14–15.)  They assert expert Sweeney opines "[i]t is highly unlikely that typical COs have the medical sophistication to appreciate respiratory insufficiency by simply looking into a jail cell from outside the cell."  (*Id*. at 15.)

Plaintiff argues she does not have to show Defendants Montano and Cordero were the sole cause of Sylvestre's death, only that Defendants' actions were a "substantial factor."  (Doc. 121 at 3, citing *Mears v. City of Los Angeles*, No. LA Cv15-08441 JAK (AJWx), 2018 WL 11305362, at *8 (C.D. Cal. May 7, 2018 ("to establish liability under § 1983, Plaintiffs bore the burden of proving by a preponderance of the evidence that Officer Gan's excessive or unreasonable use of force was a substantial factor—not the sole factor—in causing [decedent's] injuries and/or death").)

County Defendants have met their initial burden of showing the acts of Montano and Cordero were not the actual cause of Sylvestre's death.  It is undisputed Sylvestre died of acute fentanyl intoxication and the manner of death was an accident.  In addition, the evidence does not support Sylvestre would not have overdosed or died but for Montano's and Cordero's actions or inactions or that their actions or inactions were a substantial factor in Sylvestre's death.  Plaintiff has not presented evidence of what a CO in Montano's or Cordero's position was to do for a detainee who appeared to be sleeping throughout the night with a blanket over his head and showed no signs of distress or that the failure to perform those actions was a substantial factor in Sylvestre's death.

Accordingly, Plaintiff's wrongful death claim in Count Four fails, and the Court will grant summary judgment to Defendants Montano and Cordero in Count Four.

### 2.    Defendants Pima County, Kuhn, and Rivas-Pardo

County Defendants argue Defendants Rivas-Pardo, Kuhn, and Cordero had no duty to search Sylvestre's cell after the medical emergency involving another detainee, citing

correctional expert Ed Sweeney's opinion that similarly situated custody staff would not have searched Sylvestre's cell absent a particularized suspicion, and there is no evidence in the record these Defendants had any particularized suspicion.  (Doc. 103 at 11, citing Doc. 104 ¶¶ 34–35.)  Plaintiff does not dispute these facts or cite to any evidence creating a genuine issue of material fact regarding this characterization of the standard of care or even address this argument in her Response.  (*See* Doc. 121; Doc. 122 at 4 ¶¶ 34–35.)

Likewise, Plaintiff does not address County Defendants' argument Pima County had no duty to ensure "proper" communication between custody and medical staff.  (Doc. 103 at 12; *see* Doc. 121.)  And, Plaintiff does not dispute County Defendants' facts regarding the lack of such a duty, including expert Sweeney's opinion it would be contrary to national corrections standards for medical staff to discuss individual medical treatments or diagnoses with custodial staff.  (Doc. 104 ¶¶ 59–61; Doc. 122 at 6 ¶¶ 59–61.)

As noted, Plaintiff's Response asserts she only opposes summary judgment on Count Four as to Defendants Montano, Cordero, and Rivas-Pardo.  (Doc. 121 at 1.)  It is not clear why Plaintiff included Defendant Rivas-Pardo in the opening paragraph of her Response when the substance of the Response only addresses Defendants Montano and Cordero.  Because County Defendants have met their burden at summary judgment of demonstrating the lack of a genuine issue of material fact with respect to whether Pima County's, Kuhn's, and Rivas-Pardo's actions breached the standard of care, and Plaintiff has presented no evidence such that a reasonable jury could return a verdict for Plaintiff, the Court will grant summary judgment to Defendants Pima County, Kuhn, and Rivas-Pardo on Count Four.

### 3.    Defendant NaphCare

Under Arizona law, to support a medical negligence claim, the plaintiff must show (1) the "health care provider failed to exercise that degree of care, skill and learning expected of a reasonable, prudent health care provider in the profession or class to which he belongs" and (2) "[s]uch failure was the proximate cause of the injury."  Ariz. Rev. Stat. § 12-563(1)–(2).

The "yardstick" by which a healthcare provider's compliance with his duty is measured is commonly referred to as the "standard of care." *Seisinger v. Siebel*, 203 P.3d 483, 492 (Ariz. 2009). To maintain a medical tort claim, a plaintiff must present evidence the healthcare provider fell below the applicable standard of care and the deviation from the standard of care proximately caused the claimed injury. *Ryan v. S.F. Peaks Trucking Co., Inc*., 262 P.3d 863, 869–70 (Ariz. Ct. App. 2011) (citing Ariz. Rev. Stat. § 12-563). "The standard of care must be established by specific evidence. It cannot rest on conjecture or inference." *Valencia v. United States*, 819 F. Supp. 1446, 1463–64 (D. Ariz. 1993). In addition, "[u]nless malpractice is grossly apparent, the standard of care must be established by expert medical testimony." *Rasor v. Northwest Hosp., LLC*, 403 P.3d 572, 575 (Ariz. 2017); *see Seisinger*, 203 P.3d at 492 ("Arizona courts have long held that the standard of care normally must be established by expert medical testimony"). Expert medical testimony is also required to establish proximate cause. *See Rae v. United States*, No. CV-15-01551-PHX-JJT, 2016 WL 4943378, at *5 (D. Ariz. Sept. 16, 2016) (citing *Salica v. Tucson Heart Hosp.-Carondelet, L.L.C.*, 231 P.3d 946, 951 (Ariz. Ct. App. 2010)).

Defendant NaphCare argues its personnel treated Sylvestre during his January 28, 2022 overdose and his return from the hospital in accordance with the NCCHC's guidelines for treating opioid substance abuse and withdrawal, and Plaintiff agreed the care NaphCare provided to Sylvestre complied with the standard of care required of a jail medical provider. (Doc. 105 at 14–15, citing Doc. 106 ¶¶ 22–29, 59–67.) NaphCare argues its expert, Dr. Minahan, opines NaphCare's policies were within the standard of care; NaphCare appropriately trained, hired, supervised, directed, and instructed its staff; NaphCare staff provided care within the standard of care; and NaphCare staff did not contribute to Sylvestre's death. (*Id*. at 15, citing Doc. 106 ¶¶ 61, 63.) NaphCare argues that because its alleged malpractice is not apparent, Plaintiff needed to provide an expert medical opinion regarding the standard of care and causation in support of her gross negligence claim, but she did not disclose an expert and the deadline to do so has passed. (*Id*. at 15 (citing *Seisinger*, 203 P.3d at 492); *Rasor*, 403 P.3d at 575; *Windhurst v. Ariz. Dep't of Corrs*.,

1   536 P.3d 764, 771 (Ariz. 2023).)

2       Plaintiff did not respond to NaphCare's Motion for Summary Judgment, did not

3   dispute any of NaphCare's facts, and has not presented an expert medical opinion regarding

4   the standard of care and causation in support of her claim against NaphCare.  Therefore,

5   Plaintiff has not shown there is a genuine dispute of material fact NaphCare's policies fell

6   below the applicable standard of care and that the deviation from the standard of care

7   proximately caused the claimed injury.  Accordingly, the Court will grant summary

8   judgment to NaphCare on Plaintiff's claim in Count Four.

9   **IT IS ORDERED:**

10      (1)    County Defendants' Motion for Summary Judgment (Doc. 103) and

11  Defendant NaphCare's Motion for Summary Judgment (Doc. 105) are **GRANTED**.

12      (2)    Defendant NaphCare's Request for Ruling on Its Unopposed Motion for

13  Summary Judgment (Doc. 128) is **DENIED AS MOOT**.

14      (3)    This action is **DISMISSED WITH PREJUDICE**.  The Clerk of Court must

15  enter judgment accordingly.

16      Dated this 25th day of September, 2025.

Honorable Scott H. Rash
United States District Judge